658 P.2d 218

**STATE of Arizona, Appellee,**

v.

**Edward G. FAYLE, Appellant.**

**No. 1 CA-CR 3744.**

Court of Appeals of Arizona, Division 1, Department B.

Nov. 9, 1982.

Rehearing Denied Dec. 17, 1982.

Review Denied Jan. 25, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Criminal Division, Gerald R. Grant, Asst. Attys. Gen., Phoenix, and Stephen D. Neely, Pima County Atty. by John M. Roll, Deputy County Atty., Tucson, for appellee.

Kemper & Henze by James Hamilton Kemper, Phoenix, for appellant.

## OPINION

JACOBSON, Presiding Judge.

The unique facts in this appeal present the question of whether the defendant was competent to waive counsel and if so, whether the trial court improperly limited the presentation of "advisory" counsel.

The objective facts surrounding the crime of the defendant, Edward G. Fayle, are simple and straightforward. On July 27, 1972, the defendant went to the office of a Phoenix physician, Dr. Ernest W. Smith, according to the defendant, in order "to kill" Dr. Smith. When Dr. Smith walked up the sidewalk from his carport to the office building, he saw the defendant and waved at him. The defendant pulled a hidden weapon and fired directly into Dr. Smith's chest. This shot did not disable Dr. Smith, and he ran through a covered parking area and approached the back door of the building. At that point, the defendant again shot Dr. Smith twice, once on the left side of his skull. The defendant quickly left the parking lot.

When Dr. Smith was taken to the emergency room at St. Joseph Hospital he was, according to the treating physician, Dr. Polson, "very nearly dead" and "was in extreme shock from blood loss." Miraculously, Dr. Smith survived.

Charged with assault with intent to commit murder, the defendant initially was found incompetent to stand trial, and ordered committed to the State Hospital. On February 16, 1976, the charges pending against the defendant were dismissed with prejudice on the ground that there was no reasonable probability that the defendant would ever be competent to stand trial. The Arizona Supreme Court, on a petition for special action by the state, ordered that the dismissal was without prejudice.

Following a determination that the defendant was competent to stand trial, on September 22, 1977, the defendant was again indicted for the offense of assault with intent to commit murder in violation of A.R.S. § 13–248 of the criminal code in effect at that time. This indictment resulted in a jury trial where the defendant was found guilty as charged and subsequently sentenced to not less than 25 years nor more than 30 years in the Arizona State Prison.

The defendant has timely appealed. The defendant in *propria persona* initially requested that this matter be presented to the court on the record as presented in the trial court. As a result of the initial workup of this appeal by the central staff of this court, the court became concerned that it could not adequately decide this case based solely upon the record. This court then requested Mr. James Hamilton Kemper to represent the defendant on appeal and briefing ensued.

While we have indicated that the facts surrounding the shooting of Dr. Smith are simple and straightforward, the motives behind that shooting and the mental makeup of the defendant are complex.

The defendant graduated from Stanford University in 1958 with a Bachelor of Science degree in mechanical engineering. Following graduation from Stanford, he was employed by two firms as an engineer, where he held responsible positions. He, in the past, has taken entrance exams for graduate school and has been admitted to the University of California at Berkeley where he studied business administration. He holds a real estate license in California; has successfully designed and placed in operation a liquid petroleum gas distribution system and a refrigeration system. His I.Q. places him in the top 5% of the general population.

Early in the defendant's career, he became obsessed with his physical condition. In 1963, the defendant's father made arrangements for the defendant to see a psychiatrist because of his preoccupation with his health. As a result of this contact, the defendant was admitted to a psychiatric hospital in Nevada, where he stayed for five weeks until he left without permission.

The defendant believed he was suffering from tuberculosis and has written extensively on this illness. Based upon his unfounded belief, the defendant has been examined by numerous physicians for his physical ailments. When he was unable to find a doctor who would treat him for tuberculosis, he would forge prescriptions and obtain medication to treat himself. Unfortunately, Dr. Smith was just one on the long list of physicians who were unable to grant the defendant relief from his supposed illnesses.

The defendant first contacted Dr. Smith on July 7, 1969. Defendant told Dr. Smith that he thought he had tuberculosis because he constantly had a general feeling of fatigue and because he had a sore throat. A week later, Smith told the defendant that there was no evidence of tuberculosis. Smith indicated to the defendant that in his opinion, the defendant's fatigue was derived from an emotional disorder and recommended that the defendant seek the care of a psychiatrist.

On July 14, 1969, the defendant sent a letter to Dr. Smith requesting a transfer of his records to Dr. Fisher. The defendant also at that time saw Dr. Max Wertz. In 1971, Dr. Wertz scheduled a biopsy on the defendant's foot, but the surgery was cancelled September 14, 1971. A letter from Dr. Wertz indicated that Dr. Wertz had spoken to Dr. Smith and a Dr. Shapiro, and that Wertz, Smith and Shapiro agreed that the defendant had a "severe emotional disturbance, and it is highly doubtful that there is a significant undiagnosed medical condition leading to his numerous complaints." The defendant believed that Dr. Wertz had cancelled the biopsy because Dr. Smith had intervened and had told Dr. Wertz that the defendant was a hypochondriac.

On July 27, 1972, the defendant shot Dr. Smith. After the shooting, defendant drove to the desert where he buried his gun in the event he "heeded it to shoot more doctors." He placed his car in storage and took a cab to the Phoenix Police Department where he gave his statement to detective Ron Quaife and then deputy county attorney Melvin McDonald. Prior to giving the statement, he required Quaife and McDonald to read a paper he had written on tuberculosis. After he was satisfied that they had read the paper, he gave his statement to them, telling them that he had shot Dr. Smith earlier that afternoon because he had been suffering from tuberculosis for many years. He had been unable to find a doctor to diagnose his illness, and thus had been unable to get treatment for it. He claimed that the tuberculosis made it impossible for him to work for more than short periods of time because of extreme fatigue. He claimed that he shot Dr. Smith not because of anything personally against the doctor, but, in defendant's words, "I nailed him because he's the most obnoxious of the bunch. I can't—I could have killed him or anyone of the doctors, it makes no differ-

ence to me, when they realize that I'm serious, maybe I'll get a little satisfaction in my tuberculosis."

We now turn to the pertinent trial proceedings. On December 13, 1977, the attorney for the state, who also represents the state on appeal, filed a motion pursuant to Rule 11, Rules of Criminal Procedure, 17 A.R.S., to have the defendant's competency to stand trial determined. Judge Stanley Z. Goodfarb appointed Drs. Maier Tuchler and Harrison Baker to determine the defendant's competency. On January 16, 1978, Judge Goodfarb determined that the defendant was competent to stand trial after the issue was submitted on the reports of Drs. Tuchler and Baker. The trial court did not at that time find that the defendant was competent to either enter a guilty plea or to waive constitutional rights.

In February, 1978, the defendant, who had, by this time, been through numerous defense counsel, and was dissatisfied with all of them, moved to waive counsel and represent himself. On February 17, 1978, Judge Goodfarb appointed Drs. Tuchler and Baker to examine the defendant to determine his competency to represent himself and to waive his constitutional right to counsel.

The doctors jointly interviewed the defendant on March 6, 1978, and present at the interview was the defendant's then counsel of record, Stephen M. Rempe. The doctors submitted a joint report dated March 15, 1978, in which they found that "the defendant does possess the requisite emotional, mental, and intelligence capacities to waive counsel representing him at trial. However, this is considered a marginal ability and highly dependent on his ability to cooperate and work with counsel."

On April 3, 1978, Judge Valdemar Cordova, to whom the matter had been reassigned, found the defendant competent to waive counsel, based on the written report of Drs. Tuchler and Baker. He also appointed Alan Susman as advisory counsel for the defendant.

On June 19, 1978, the defendant filed a motion to dismiss Susman and a statement indicating that he did not intend to present an insanity defense. On that same date the prosecutor requested the trial court to hold a new hearing to determine the defendant's competency to represent himself. Prior to the hearing on that request, the defendant resubmitted a motion to dismiss Susman as advisory counsel. During the hearing on the motion, the prosecutor presented interrogatories completed by Dr. Tuchler which indicated that if the defendant refused to present an insanity defense he was not competent to represent himself. Both motions were denied and the trial court found that the defendant had waived the issue of insanity, and that this defense would not be presented to the jury unless the defendant presented evidence at trial on the issue. The defendant at that point indicated that he might want to present evidence on the issue of insanity.

On the first morning of trial, July 10, 1978, Susman, as advisory counsel for the defendant, asked the trial court again to determine the defendant's competency to represent himself based on statements by both Drs. Tuchler and Baker to the effect that they had changed their opinion of the defendant's competency to represent himself. They had concluded that if the defendant refused to present the insanity defense, he was not competent to represent himself. The defendant at that point indicated that he would probably give the jury the option of finding him either not guilty or not guilty by reason of insanity. Susman's motion for a redetermination of the defendant's competency to represent himself was denied by the trial court and the matter proceeded to trial.

On July 12, 1978, during trial, Susman moved to withdraw as advisory counsel for the defendant, arguing that he was in an ethical conflict because while the defendant said he could put on an insanity defense, he had not been allowed to present the entire defense as he would have had he been solely representing the defendant. Susman pointed out that there were additional witnesses he would call on behalf of the defendant to support an insanity defense, and that he

had not been allowed to make either an opening statement nor was the defendant going to allow him to make a closing argument. Susman indicated that he had not been allowed to cross-examine Dr. Smith on the issue of the defendant's insanity. The defendant responded that Susman could call two or three witnesses in support of an insanity defense. The trial court denied Susman's motion to withdraw, finding that Susman could cross-examine the witnesses Susman called on the insanity defense, the defendant could cross-examine the other witnesses, and the defendant and Susman would not be allowed to "double team" any witness. Susman also moved for a hearing to determine the voluntariness of the defendant's statement to the police immediately after the shooting before the statement was admitted into evidence. The trial court did find that the statement was voluntary.

As the trial proceeded, the defendant put on evidence to the effect that he was suffering not from tuberculosis, but from hypoglycemia which could also ostensibly affect one's mental condition. He introduced numerous publications by various orthomolecular physicians and practitioners in bariatric medicine. The court informed the defendant that he would not instruct the jury on the defense of justification because it was not a legally recognized defense.

Susman was allowed to call Dr. Floyd Templeton, M.D., who conducted a psychiatric examination of the defendant on August 16, 1972. Dr. Templeton testified that the defendant had a schizophrenic reaction paranoid type and that the defendant was insane. He also concluded that the defendant suffered from somatic delusional system which could lead him to appear normal in all other regards outside the operation of the delusional system. Templeton testified that within this system the defendant wanted to have his day in court, and that he honestly believed that a jury would proclaim him a hero for exposing the refusal of the medical profession to treat tuberculosis. He concluded that the desire of the defendant to have his day in court and present his "justification" defense was consistent with the defendant's insanity.

Susman was also allowed to call Frances Enos, a psychologist, who had previously examined the defendant. Dr. Enos concluded that the defendant suffered from paranoid schizophrenia which rendered him insane at the time he committed the offense. Enos indicated that the defendant had an "incapsulated delusional system" and as a result of this delusion the defendant thought that the shooting was right and believed he would be exonerated by a jury. Susman also called Dr. O'Gorman, who had treated the defendant in Las Vegas, and had diagnosed the defendant as having a schizophrenic reaction of pseudoneurotic type. Dr. O'Gorman had been retained by the defendant's father to examine him, and recommended the defendant's placement in the hospital in Nevada from which the defendant subsequently escaped.

On July 18, 1978, Susman again moved for a mistrial based on the claim that the defendant was not competent to waive his right to counsel and represent himself. In support of his motion, Susman presented the testimony of Dr. Tuchler at a hearing out of the presence of the jury. At that hearing, Tuchler testified that given the defendant's mental health history, the issue of insanity was an important one for him to present. Tuchler further testified that the defendant was not qualified to represent himself in the area of insanity. The court, defense counsel, and the prosecutor described to the physician how the trial had been proceeding, with the defendant presenting evidence to the effect that he suffered from hypoglycemia, and Susman was being allowed to present some evidence of insanity. The doctor responded that the defendant "is not even recognizant at this moment of the basic issues. He is more concerned with proving a physical disability." When asked if the defendant was competent to represent himself if he allowed his attorney to present an insanity defense, the doctor responded that if he would allow his attorney to bring up the defense of insanity, the defendant was competent to represent himself. The doctor stated however, "but 1

think the issue of what is presented, Mr. Fayle is much too emotionally entangled with the hypoglycemia concept that he should not be permitted to overrule his own attorney in the matter of the insanity defense." The doctor also indicated that the defendant was not trying to prove what he did and why he did it but rather that he had hypoglycemia. The following exchange then occurred between the doctor and Susman:

Q Well, would the fact that he is limiting his attorney change your opinion as to his competence to represent himself in this case?

A It would alter it somewhat.

The trial court interrupted the proceedings at that point indicating the court's confusion as to why the hearing was occurring at all, and defense counsel responded that the hearing was being held because defense counsel did not believe the defendant was competent to present his own legal defense and that a mistrial should be granted and a new trial scheduled with an attorney to present the defense. The trial court denied the motion for mistrial, pointing out that it had allowed the defense of insanity to be presented. In response to Susman's argument that "a limitation of a defense is not the same as putting on a defense completely," the court stated "I have decided that Mr. Fayle is going to be given a chance to present his story to the jury." The court also indicated that it would give the jury three forms of verdict, not guilty, guilty, and not guilty by reason of insanity. The court concluded that if it granted the motion for a mistrial it would "have to tell Mr. Fayle that he would have to withdraw his other concept and his whole theory of his defense in this case. And unless I have mistaken, I don't think Mr. Fayle wants to withdraw that." The court concluded that it was the defendant's liberty that was at stake and denied the motion for mistrial.

The trial resumed and Dr. Tuchler testified for the state that he had examined the defendant on numerous occasions beginning August 16, 1972, and concluding March 1, 1978. He diagnosed the defendant as hav-

ing a schizoid personality with paranoia, but concluded that the defendant was sane. On cross-examination Dr. Tuchler testified that the defendant suffered from a somatic delusion that he had tuberculosis, and that he used the delusion to attempt to justify his action in shooting Dr. Smith. Dr. Tuchler also testified on cross-examination by the defendant that the defendant was being allowed to represent himself only because Dr. Tuchler believed he was competent to represent himself.

Dr. Cleary, M.D., who worked at the Arizona State Hospital during the four years that the defendant was there, also testified for the state that in his opinion the defendant was not legally insane at the time he shot Dr. Smith. He also indicated that the defendant suffered from paranoid schizophrenia and that he had a somatic delusion concerning his tuberculosis. Susman was allowed to cross-examine Dr. Cleary.

Following the presentation of evidence, the prosecutor and the defendant made closing arguments, but Susman was not allowed to make such an argument. In closing, the defendant told the jury as follows:

I have not presented an insanity defense myself. I have allowed Mr. Susman to present one because at one time— well, I saw what happened when I tried to introduce my evidence, Mr. Roll attacked everything and I thought I'd be left without anything at all, so I thought if he wants to put on an insanity defense, at least that is something.

The defendant also told the jury:

So, if I were doing it again, if I knew how things were going to turn out, I would not have allowed Mr. Susman to put on an insanity defense. I would only have two verdicts presented to you. It would either be innocent or guilty and I'd either get cut lose [sic] or I'd go to prison.

Finally, he told the jury:

But I'm not willing to admit I'm insane. I'd rather go to prison that admit I'm insane .... I definitely want to stay out of that nuthouse anyway [sic] I can.

On July 20, 1978, the jury found the defendant guilty as charged.

On October 13, 1978, the trial court imposed a sentence of not less than 10 nor more than 12 years imprisonment, excluding the approximately 4 years the defendant was at the Arizona State Hospital, but granting credit for 21 months the defendant had spent in jail awaiting trial. The victim was present at sentencing, and the trial court inquired of the defendant whether he wanted to put anything on the record to indicate that Dr. Smith "might rest at ease and feel comfortable and not have to be in hiding when you [the defendant] get out of prison?" The trial court informed the defendant that unless he made an irrevocable decision that Dr. Smith would be safe when the defendant got out of prison, the court would have to consider a longer sentence. The defendant responded:

Your Honor, throughout these proceedings, I have attempted to make clear my attitude towards Dr. Smith and I have informed the court on past occasions I consider the man a fool. I consider him a very poor physician. I consider myself a victim of Dr. Smith.

The defendant indicated that his feelings toward Dr. Smith were a slight hostility, and that he didn't dislike Dr. Smith any more than he disliked most of the rest of the legal profession or medical profession. The defendant also asked the court: "What can I do, go over and kiss him?" At that point, the court, indicating that the defendant showed no remorse for shooting Dr. Smith, changed the sentence to not less than 25 years nor more than 30 years with the recommendation that there not be an early release by parole.

The first issue raised is whether the trial court properly determined that the defendant was competent to waive counsel. Corollary to this issue is that assuming competency to waive was present, did the trial court err in subjecting the defendant to advisory counsel which resulted in a "hybrid" representation.

It is now clear under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), that a criminal defendant has a constitutional right under the sixth amendment to represent himself.[1]

The right of self-representation, however, must be weighed against that traditional notion that courts indulge in every reasonable presumption against a waiver of fundamental constitutional rights. *Johnson v. Zerbtz,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The determination of whether there is an intelligent waiver of the right to counsel depends upon the facts and circumstances of a given case, including the background, experience, and conduct of the accused. *State v. Doss,* 116 Ariz. 156, 568 P.2d 1054 (1967). A defendant who is mentally incompetent cannot knowingly or intelligently waive his constitutional rights. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The validity of a waiver of the right to counsel is based not on the question of the defendant's skill and experience in determining his ability to represent himself, but whether the defendant has made a knowing and voluntary relinquishment of his constitutional right to counsel. If a defendant is too emotionally disturbed to make a knowing waiver of his right to counsel, the waiver is invalid. *State v. Doss, supra.*

*Pate v. Robinson, supra,* has been interpreted as imposing a continuing duty on the trial court to inquire into the defendant's competency to stand trial at any time there is evidence of his incompetency. *De Kaplany v. Enomoto,* 540 F.2d 975 (9th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977). In our opinion, this continuing duty of the trial court to order hearings on the issue of the defendant's competency to waive his basic constitutional rights must likewise obtain when

---

1. The United States Supreme Court held in *Faretta:*

It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." (citation omitted). 422 U.S. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 581.

the question involved is the competency to waive the right to assistance of counsel. *See De Kaplany v. Enomoto, supra; Sieling v. Eyman,* 478 F.2d 211 (9th Cir.1973).

Applying these standards to the facts of this case, we must review three separate occasions when the trial court was called upon to judge the defendant's competency to waive counsel. The first of these occurred prior to trial on April 3, 1978. At that point, the defendant had appeared before the trial court several times, and although he may have been belligerent upon occasion, the trial court's observations of the defendant led the court to conclude that the defendant was certainly capable concerning matters of procedure, the presentation of evidence, and the argument of motions. Moreover, the report of Drs. Tuchler and Baker before the trial court concluded that the defendant was competent to waive basic constitutional rights including the right to waive counsel, although such ability on the part of the defendant was marginal depending upon the defendant's cooperation with counsel. Based on the evidence before Judge Cordova at the time, Judge Cordova properly determined that the defendant was competent to represent himself.

 The question remains, however, whether Judge Chatwin, who presided over the trial, properly denied the repeated motions made by Susman to determine the defendant's competence to waive his right to counsel and for a mistrial. The original motion before the trial court came the first morning of trial prior to the presentation of any evidence. At that time, defense counsel indicated that Drs. Tuchler and Baker had changed their minds and indicated that the defendant was incompetent to waive his right to counsel and to represent himself if he refused to present an insanity defense. During that hearing, the trial court noted that Judge Cordova had already determined the defendant was competent to represent himself, and Judge Cordova's ruling was the law of the case. The trial court's basis for its conclusion was incorrect inasmuch as the trial court has a continuing duty to

inquire into the competence of the defendant to waive fundamental constitutional rights when substantial evidence of that incompetence is presented. Nevertheless, we must determine based on the evidence presented to the trial court, whether the substance of its ruling was correct at that time. At this hearing, the defendant indicated that he would agree to allow Susman to present evidence of an insanity defense. He agreed that Susman could call the witnesses he desired to call and examine them thoroughly on the issue of insanity. Given that the defendant's refusal to allow the presentation of an insanity defense was the sole basis for Dr. Tuchler's and Baker's change of opinion concerning the defendant's competency to waive his right to counsel, we conclude that the trial court did not err in denying Susman's motion on the first day of trial.

A much more difficult question is presented concerning the propriety of the trial court's ruling with regard to the motion for mistrial on July 18, 1978, when Dr. Tuchler testified. At that point, the defendant had cross-examined many witnesses articulately, and had presented some evidence in his own behalf. The defendant had cooperated with the trial court, made articulate objections, discussed strategy, and demonstrated at that point a thorough understanding of the functions of courts, judges, prosecution and defense attorneys. There could be no doubt that the defendant was capable of functioning appropriately in trial, because he had clearly so demonstrated.

 Weighed against Fayle's obvious skill in representing himself, however, was the question of whether he was mentally competent to voluntarily and intelligently relinquish to his advisory counsel the right to present the only viable defense available —insanity.

From an evidentiary standpoint, testimony had already been presented from Dr. Templeton and Dr. Enos that while the defendant would appear normal in all other regards, he suffered from a delusion which required him to believe it was right to shoot

Dr. Smith and that the jury would exonerate him for doing so. The trial court, the prosecutor and defense counsel accurately and completely described to Dr. Tuchler the nature of the trial, the defense that was being presented, and the role which the defendant was allowing Susman to play in the trial. The final conclusion of the doctor was to the effect that the defendant was competent to waive his right to counsel, and to represent himself as long as defense counsel was allowed to present evidence of insanity. When defense counsel pointed out to the doctor that he was being allowed to present a limited defense of insanity rather than a full defense of insanity, the doctor responded that his opinion might be altered somewhat. Nevertheless, at trial, Dr. Tuchler did not retreat from his position that the defendant was competent to waive his right to counsel and represent himself.

There is no doubt from this record that defendant knew he had a right to counsel, the role of counsel and that he appreciated the consequences of waiving counsel. Thus, although the defendant's defense was a product of his delusion, and, although his compulsion to present the defense may also have been a product of his delusion, the record clearly reveals that the defendant was in control of his faculties with regard to understanding his constitutional rights, and that he was competent to make a knowing and intelligent waiver of his right to counsel.

Up to this point, we have discussed this issue in the context of waiver of counsel which is somewhat misleading, as advisory counsel was present and did present an insanity defense, albeit limited. The real issue presented is whether the trial court should have acquiesced with advisory counsel's demands and allowed counsel to present a total defense of insanity, which the defendant rejected.

The cases which have dealt with this issue involve situations in which *both* the defendant and his counsel have refused the defense of insanity, giving rise to the duty, if any, of the trial judge under these circumstances to impose the defense. The rationale of these cases is helpful in resolving the issue presented here.

The leading case in the area is *Whalem v. United States,* 346 F.2d 812 (D.C.Cir.1965), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965). In *Whalem,* the trial court declined to impose an insanity defense against the defendant's will. The United States Circuit Court of Appeals affirmed this ruling on the basis that under the particular facts of that case, the trial court did not abuse its discretion in refusing to impose the defense. However, the court noted that "when there is sufficient question as to defendant's mental responsibility at the time of the crime, that issue must become a part of the case." 346 F.2d at 818.

The rationale for the trial judge imposing the defense over the defendant's objections is the duty of the court to uphold the "structural foundation" of the criminal law. This "foundation" was explained:

> One of the major foundations for the structure of the criminal law is the concept of responsibility, and the law is clear that one whose acts would otherwise be criminal has committed no crime at all if because of incapacity due to age or mental condition, he is not responsible for those acts.

346 F.2d at 818.

The result in *Whalem* was criticized and modified in another decision arising out of the District of Columbia, this time by the District of Columbia Court of Appeals, in the case of *Frendak v. United States,* 408 A.2d 364 (D.C.1979). In *Frendak,* the trial court, following the dictates of *Whalem,* imposed the insanity defense over the objections of both the defendant and her counsel. The District of Columbia Court of Appeals reversed, holding that the trial court must defer to the wishes of the defendant if the defendant "voluntarily and intelligently" rejects the defense. "Voluntary" is explained by *Frendak* as requiring the defendant to freely choose (the absence of legal coercion) to reject the defense. The "intelligently" portion requires that the defendant be informed of the alternatives

available and that the defendant understand the consequences of not employing the defense.[2] The basis of the *Frendak* court's holding was that because of the United States Supreme Court's decision in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1975) and *Faretta v. California, supra,* deference must be given to a defendant's voluntary and intelligent choices, even though those choices may be detrimental to the defendant.

In *Alford,* the United States Supreme Court held that even though a defendant professes innocence, he may plead guilty to avoid the consequences that his not guilty plea might impose. In *Faretta,* the court held that a defendant is entitled to self-representation even though the defendant's ignorance of legal material might result in poor trial performance.

The rationale of the *Frendak* court was summed up by noting that:

> Because the defendant must bear the ultimate consequences of any decision, we conclude that if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense.

408 A.2d at 378.

 In our opinion, the *Frendak* approach is on sounder legal ground. Assuming that a defendant is competent to waive constitutional rights, that defendant may have a myriad of strategic reasons for rejecting an insanity defense even though such a defense might be successful. The defendant's situation in this case highlights at least two such reasons. As the defendant noted in his final argument to the jury, the insanity defense in this case disparaged and denied the defendant's motive in committing the crime—he was justified in shooting doctors who refused to treat his tuberculosis. A defendant has the right to have the jury consider his story, no matter how bizarre. *See United States v. Robert-*

*son,* 507 F.2d 1148 (D.C.Cir.1974). We also recognize that a mental illness does not necessarily deprive one of responsibility for his acts.

Moreover, as the defendant's final argument in this case makes clear, a defendant may well prefer incarceration in the state prison for a definite term rather than an indefinite commitment to the state hospital which would follow a "not guilty by reason of insanity" verdict. *See* Rule 25, Arizona Rules of Criminal Procedure. The defendant's plaintive cry of "I definitely want to stay out of that nuthouse any way I can," is illustrative.

The commentators have suggested other valid reasons for rejecting an insanity plea: The quality of treatment received in a mental institution, *see,* Note; Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harvard L.Rev. 1190 (1974); the desire to avoid the stigma of an adjudication of insanity, *see,* Cocozes, Public Perceptions of the Criminally Insane, 29 Hospital and Community Psychiatry 457 (1978); the desire to avoid a "compromise" verdict; and the defendant's personal opposition to psychiatric treatment, *see,* Plotkin, Limiting the Therapeutic Orgy: Mental Patient's Right to Refuse Treatment, 72 Northwestern U.L.Rev. 461 (1977).

When these legitimate personal interests of the defendant are totalled, the "structural foundation" of the criminal law argument must be outweighed. *Alford v. North Carolina, supra,* and *Faretta v. California, supra,* make this clear.

 In this case we have held that the defendant was competent to waive constitutional rights. The evidence further supports the determination that the defense of insanity was reluctantly imposed upon the defendant, he fully knowing and understanding the consequences of that defense. Under these circumstances, we find no error in the trial court refusing to impose a

---

**2.** The subject of imposing an insanity defense over the objections of the defendant is the subject of two excellent law review articles: The Right and Responsibility of a Court to Impose the Defense of Insanity Over the Defendant's Objections, 65 Minn.L.Rev. 927–960 (1981); Singer, The Imposition of the Insanity Defense on an Unwilling Defendant, 41 Ohio St.L.J. 637 (1980).

more complete presentation of that defense than the defendant was willing to accept. Nor can we say that such "complete" presentation would have changed the outcome of this case.

■ For his second issue on appeal, the defendant contends that he was denied his constitutional right to self-representation by having a "hybrid" representation imposed upon him. He contends that the trial court, in forcing him to accept against his will a state-appointed counsel, deprived him of his constitutional right to conduct his own defense. In *Faretta v. California, supra,* the United States Supreme Court pointed out:

[A] State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. (Citation omitted).

Footnote 46, 422 U.S. at 834, 95 S.Ct. at 2525, 45 L.Ed.2d at 581. Thus, advisory counsel may be appointed over the defendant's opposition. *State v. Carter,* 1 Ariz. App. 57, 399 P.2d 191 (1965).

■ In this case, although the defendant objected to having Susman as advisory counsel, he did not object to having advisory counsel appointed. A defendant does not have the right to the appointment of counsel of his choosing. *State v. Evans,* 125 Ariz. 401, 610 P.2d 35 (1980). Although the defendant at various times prior to trial objected to the presentation of an insanity defense by advisory counsel, he acquiesced to the presentation of such a defense by the time of trial. He allowed Mr. Susman to call as witnesses Dr. Templeton, Dr. Enos, Dr. O'Gorman, and the defendant's father without objection from the defendant. He allowed Susman to cross-examine other witnesses including Dr. Tuchler, Dr. Cleary, Melvin McDonald, and Officer Quaife without objection. He allowed defense counsel to make certain motions in his behalf without objection. Prior to trial, Judge Cordova informed the defendant that advisory counsel was there for the defendant to avail himself of counsel's services. The court stated, "If you don't wish his services you don't have to ask him anything. That choice is entirely up to you. At least the record will show that the Court afforded you the opportunity to a licensed practicing attorney to advise you regarding legal matters."

On July 11, 1978, the trial court gave the defendant the opportunity to decide for himself whether advisory counsel would put on a defense, and the defendant informed the trial court that he wanted advisory counsel to put on an insanity defense. On July 12, 1978, the defendant reiterated his intention to allow advisory counsel to put on an insanity defense. On that same date the defendant informed the trial court: "I like keeping Mr. Susman on a short leash, Your Honor. I am not at all unhappy." He also stated: "Mr. Susman is under control from my point of view. The Court wouldn't allow him to do things I don't want him to do." Finally, in closing argument, the defendant told the jury that while he had not presented an insanity defense, he had allowed advisory counsel to present one.

■ Therefore, although the defendant may not have wanted Susman to be his advisory counsel, it is clear that the defendant at no time objected to having advisory counsel and used that advisory counsel when it suited his own purpose. Under these circumstances, we find that the defendant's right to self-representation was not violated.

■ The defendant next asserts that the trial court incorrectly advised the jury during voir dire that the presumption of innocence "existed only to cast the burden of proof on the state", and that this instruction constitutes fundamental error because it reduced the due process guarantee of a presumption of innocence to a mere technical device which shifted the burden of proof to the state. During voir dire, the trial court advised the jury as follows:

Now, in a case such as this where the defendant is charged with assault with intent to commit murder, there is a presumption of innocence that goes with the defendant throughout the course of the trial until all of the evidence is in and the matter is submitted to you for your verdict in this case. The purpose of that presumption of innocence is to cast upon the State the burden of proving the guilt of the defendant beyond a reasonable doubt, with all of the terms of that charge, all of the elements that go to make the charge of assault with intent to commit murder.

Now, that is just for the simple purpose of casting upon the State the burden of proving the guilt ... the burden of proof of guilt is upon the State by what we call proof beyond a reasonable doubt.

Neither the defendant nor his attorney objected to the trial court's statement.

Soon after the trial court made this statement, the court continued on voir dire to tell the jury:

This is a criminal case in which the burden of proof lies upon the State to prove the case beyond a reasonable doubt and all its elements; whereas in a civil case, the burden of proof is upon the plaintiff to prove the allegations of the complaint only by what we call a preponderance, which is a considerably lesser burden than is involved in a criminal case. Do all of you understand that? And you will treat this as a criminal case?

I will ask you another question in that line: Can each of you assure the Court and the State that you will require the State to prove the defendant guilty beyond a reasonable doubt before you return a verdict of guilty? I take it that all of you are agreeable to that principle of law and would so assure the Court and the State.

Examined as a whole, we conclude that the trial court did not err in its statements concerning the presumption of innocence and the burden of proof beyond a reasonable doubt during voir dire. The presumption of innocence does have the effect of imposing on the state the burden of proof beyond a reasonable doubt. They are inextricably related. In no way during voir dire did the trial court minimize the effect of the presumption of innocence. The trial court merely explained the presumption of innocence as casting the burden of proof on the state. Moreover, the trial court instructed the jury at the end of the trial as follows:

The charge is not evidence against the defendant and you must not think the defendant is guilty just because he has been charged with a crime. The defendant has pled not guilty and the defendant's plea of not guilty means that the State must prove every part of the charge beyond a reasonable doubt.

\* \* \* \* \* \*

The law does not require the defendant to prove his innocence. He is presumed by law to be innocent. This means the State must prove all of its case against the defendant. The State must prove the defendant guilty beyond a reasonable doubt.

In *State v. Whitaker,* 112 Ariz. 537, 544 P.2d 219 (1975), the supreme court held that the identical instruction on the presumption of innocence and burden of proof was adequate to explain both doctrines. We find no error.

For his fourth issue on appeal, the defendant contends that the trial court erred in not determining the voluntariness of his statement to the police after he shot Dr. Smith before the trial court admitted the statement. Prior to the admission of the statement, but following the testimony of Officer Brunk, whom Fayle first approached when he entered the police station, the following exchange occurred between the court and advisory counsel.

MR. SUSMAN: I think, under the rules, you're going to have to make a determination on the record, based on that statement, to go with the reports regarding Mr. Fayle in 1972, since he was committed. If I were the defense attorney, it would be my position, obviously that the statement was not voluntarily

given because he wasn't capable of making a voluntary decision. So, regardless of what the Court's ruling is, it has to make one for the record.

THE COURT: The Court would have to find that, by reason of the content of that statement, which includes questions as to voluntariness and an affirmative response to those questions, also coupled with the statement of Officer Brunk that he was the desk officer and the fact that the defendant walked in voluntarily and surrendered to the desk officer and made his statement there all voluntarily, he was not in custody. There was no situation there that could indicate that it was other than voluntary. I would have to rule that the statements made before Quaife and McDonald were voluntarily made, based on the questions and answers there, and upon your coming to the police department and speaking to the desk officer and telling him what you had done and why you were there.

MR. SUSMAN: And that he was mentally competent to make those statements.

THE COURT: And that he was mentally competent to make those statements.

MR. SUSMAN: Okay.

THE COURT: That is on the record now.

MR. SUSMAN: I think that is the finding we needed before those statements could be brought out, as opposed to waiting until they started to do it.

■ The defendant contends that the trial court's findings do not comply with the requirement of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that the court hold a hearing outside the presence of the jury to determine the voluntariness of a defendant's confession. It is clear that a defendant does have a constitutional right to object to the use of his confessions and to have a hearing on the issue of voluntariness. *Jackson v. Denno, supra; Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). However, absent an objection by the defendant to the admission of his confession, the Constitution does not require a voluntariness hearing to be held. *Wainwright v. Sykes, supra; State v. Alvarado,* 121 Ariz. 485, 591 P.2d 973 (1979).

In this case, the defendant wanted his statement to the police to be received in evidence. The defendant told the trial court on July 12, 1978, during trial, that he wanted the statement admitted into evidence. He also stipulated that his statement was voluntarily made. Finally, when the transcript of the defendant's statement was offered into evidence the defendant stated: "We have no objection." Thus, assuming the defendant was competent to waive his constitutional right to object to the use of his statements and to have a hearing determining the voluntariness of the statements, the defendant has waived any objection to their admission.

■ The same principles which are applicable to the competence to waive the right to counsel at trial are also applicable to a waiver of a right to have the voluntariness of a statement determined. *See e.g., State v. Doss, supra.* The same principles are also applicable to waiver of counsel at the time of custodial interrogation. *State v. Doss, supra.* As we have previously held that the defendant was competent to waive these constitutional rights, he was competent to waive a voluntariness hearing and not object to the introduction of his statements.

The fifth issue on appeal is whether the trial court erred in refusing the request of advisory counsel to instruct on the offense of aggravated assault as a lesser included offense of assault with intent to commit murder.

In support of his claim that he was entitled to a lesser included offense instruction, the defendant points to his testimony to the jury. During his testimony the defendant stated:

> Three reasons or extenuating circumstances from my assault on Dr. Smith and why the jury should find me not guilty. One is that I have been charged with

assault with intent to commit murder. I did not intend to murder Dr. Smith.

I believe that is the wrong charge. My goal was to get into court and to scare Dr. Smith, scare those other doctors.

And I did assault him, of course, and I did intend to injure him, no doubt about that. And he may have died I'll concede that.

But I did not intend at that time to murder him. I believe that is the wrong charge.

l think I should be charged with something like assault to commit great bodily harm or something of that nature.

Further in his testimony, the defendant stated:

So now there is only one person who actually knows whether I intended to kill Dr. Smith or I didn't intend to kill him and that is me. And in all, of course, heretofore I've already said I did intend to kill him. My goal was to get a trial. All these doctors that say what I have said and reports that have been submitted, that all came from my mouth so you can choose to believe me or you can choose to disbelieve me but I do believe I'm being accused of the wrong crime.

I did not intend, I do not believe I should be found guilty of assault with intent to commit murder because it was not my intention to commit murder. It was my intention to do substantial harm to Dr. Smith but that is another charge and I don't have that charge on me at this time.

The state argues that the defendant was not entitled to an instruction on aggravated assault as a lesser included offense of assault with intent to commit murder because the evidence does not support the giving of such an instruction. The state contends that in view of the evidence of planning, infliction of multiple injuries, extent of injuries, and the statements made by the defendant immediately afterwards to the police to the effect that he intended to kill the doctor, the evidence is reasonably subject to only one interpretation, i.e., that the defendant intended to kill Dr. Smith. The state also points to the fact that in the opening statement the defendant told the jury, "I did everything I could to kill Dr. Smith", and "My intention was to kill Dr. Smith. I had a definite scheme in mind. He did not die, very suprisingly. Remarkable", and further, "And I did my best to kill him. I thought I'd be better off with a dead doctor than a wounded doctor." The state points to the defendant's statement to Detective Quaife and then deputy county attorney Melvin McDonald to the effect that the defendant shot Dr. Smith three times because he did not kill him the first two times and because he wanted him dead. Also in that statement the defendant told the detective and the attorney that he would have shot a fourth time when the doctor was lying on the ground but he was out of ammunition. The defendant finally told his interviewers in response to a question concerning whether he would feel that he accomplished anything if he went to prison for his act that in fact he had accomplished the killing of one doctor.

The defendant was charged under the provisions of the former Criminal Code § 13–248 with assault to commit murder. That section defined the offense as an assault with intent to commit murder. Therefore, any assault, whether aggravated or not aggravated accomplished with the intent to commit murder would constitute a violation of § 13–248. Accordingly, any aggravated assault pursuant to the former A.R.S. § 13–245 was a lesser included offense of assault with intent to commit murder.

■ The defendant was thus entitled to an instruction on aggravated assault if there was evidence of the lesser included offense and the jury could find that the state had failed to prove an element of the greater offense. *State v. Dugan,* 125 Ariz. 194, 608 P.2d 771 (1980).

■ The trial court must determine before giving a lesser included defense instruction "whether on the evidence the jury could rationally find that the state failed to prove an element of the greater offense."

125 Ariz. at 195, 196, 608 P.2d at 772, 773. Here, based on the evidence, the jury could not rationally have found that an aggravated assault had been committed. There was no dispute that the defendant purchased a gun, lay in wait for Dr. Smith, and after observing his comings and goings for several days, shot him once from a distance. When Dr. Smith was lying wounded on the ground, defendant approached him and shot him twice at point blank range, once in the head, and would have shot him again had he not run out of ammunition. The defendant's self-serving testimony to the contrary, there still was no evidence on which the jury could rationally have found that the state failed to prove that the defendant intended to commit murder when he assaulted Dr. Smith. *See e.g. State v. Boag,* 104 Ariz. 362, 453 P.2d 508 (1969).

Finally, the defendant asserts that the trial court erred by initially sentencing him to 10 to 12 years and thereafter imposing a sentence of 25 to 30 years. The defendant argues that his second sentence is violative of the double jeopardy provisions of the Constitution.

In making its argument, the defendant relies on *State v. Wheeler,* 108 Ariz. 338, 498 P.2d 205 (1972). In that case, the trial court imposed sentences of five to six years on each charge. The defendant apparently turned to his attorney and struck him on the chin and throat, and the trial court attempted to resentence the defendant immediately. Two days later the trial court formally resentenced the defendant to not less than 5 nor more than 6 years on the robbery charge and not less than 24 nor more than 25 years on the attempted rape, the sentences to run consecutively. The Arizona Supreme Court, relying on *Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874), and *State v. Johnson,* 108 Ariz. 116, 493 P.2d 498 (1972) held that the attempt to increase a punishment after the imposition of a valid sentence constitutes double jeopardy. The court stated that a judgment is complete and valid "when it is orally pronounced by the court and entered in the minutes." 108 Ariz. at 341, 498 P.2d at 208. The minutes in this case reflect

that the defendant was originally sentenced to serve not less than 10 nor more than 12 years imprisonment, and was then resentenced to serve not less than 25 nor more than 30 years imprisonment.

The state, while conceding the validity of *Wheeler* and *Johnson* contends that the holding in these cases have been cast into serious doubt by the recent United States Supreme Court ruling in *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). At issue in *DiFrancesco,* was whether a provision of the organized crime control act dealing with "dangerous special offenders" which would allow the government to appeal a sentence, and the Circuit Court of Appeals to increase a sentence, violated the double jeopardy clause of the United States Constitution. In holding (5 to 4) that neither an appeal nor an increase in sentence on appeal would violate principles of double jeopardy, the majority stated:

> [O]ur task is to determine whether a criminal sentence, once pronounced, is to be accorded constitutional finality and conclusiveness similar to that which attaches to a jury's verdict of acquittal. We conclude that neither the history of sentencing practices, nor the pertinent rulings of this court, nor even considerations of double jeopardy policies support such an equation.

449 U.S. at 132, 101 S.Ct. at 435, 66 L.Ed.2d at 343.

While we might agree that equating sentencing finality with acquittal finality for purposes of defining double jeopardy protection is not warranted, this does not answer the question presented here—is a defendant protected under the double jeopardy clause from having post sentence conduct utilized to increase a validly imposed sentence?

Our reading of *DiFrancesco* is that Congress can constitutionally provide for a government appeal of sentences and an appellate increase of sentences. This is all it stands for.

Nor is *Bozza v. United States,* 330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947), also

cited by the state, to the contrary. In *Bozza,* the trial court originally entered a sentence not authorized by statute. Five hours later, realizing its mistake, the court recalled the defendant and resentenced him to a valid statutory sentence. The United States Supreme Court held that this did not violate the double jeopardy clause.

■ In Arizona, however, we have long held that post-conviction conduct cannot be utilized to *decrease* a valid sentence. *State v. Pike,* 133 Ariz. 178, 650 P.2d 480 (1982). *Wheeler* and *Johnson* prohibit such post-conviction conduct from being utilized to *increase* a valid sentence.

■ The judgment of conviction is affirmed. The sentence is modified by striking the last imposed sentence of not less than 25 years nor more than 30 years and reinstating the prior sentence of not less than 10 years nor more than 12 years, granting credit for 21 months that the defendant spent in jail awaiting trial.

GRANT and BROOKS, JJ., concur.