829 P.2d 322

**The STATE of Arizona, Appellee,**

**v.**

**Alexsandro Vincente BRAVO, Appellant.**

**No. 2 CA–CR 90–0332.**

Court of Appeals of Arizona,
Division 2, Department A.

Sept. 24, 1991.
Review Denied May 19, 1992.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Joseph T. Maziarz, Phoenix, for appellee.

Thomas J. Phalen, Phoenix, for appellant.

HOWARD, Judge.

In 1984 the state indicted appellant for the armed robbery, aggravated robbery and aggravated assault of Raland Tinker. The state subsequently filed another indictment charging appellant with the first-degree felony murder and armed robbery of Julie Wong. The charges were subsequently consolidated upon the state's motion.

The first trial occurred in 1985 and appellant was convicted on all three counts relating to Tinker as well as the first-degree felony murder of Julie Wong. However, appellant was acquitted of the armed robbery of Julie Wong. These convictions

were appealed and the supreme court in *State v. Bravo*, 158 Ariz. 364, 762 P.2d 1318 (1988) (*Bravo I*), affirmed most of the trial court's pretrial rulings, including the trial court's denial of appellant's motion to suppress statements, but held that the trial court committed prejudicial error in refusing to suppress the testimony of a witness whose existence was disclosed by the defendant after he had exercised his Miranda rights. Thus, the court reversed appellant's convictions, remanding the matter for a new trial.

Following remand, appellant filed a motion to sever the Tinker counts from the Wong murder count. The trial court denied this motion. Appellant also filed a motion to preclude the state from presenting evidence, arguing or obtaining a jury instruction on felony murder. The trial court ruled the state could proceed on a felony murder premised upon the underlying felony of third-degree burglary, but not attempted armed robbery.

Appellant was convicted of first-degree murder of Julie Wong but found not guilty of the armed robbery and aggravated assault of Tinker. The trial court sentenced appellant to life imprisonment, crediting him with 584 days of presentence incarceration and ordering that he pay $100 to the victim compensation fund.

Appellant contends the trial court erred in not suppressing his confession, in allowing him to be tried on a charge barred by the doctrine of double jeopardy and in not granting his motion to sever. We do not agree and affirm. However, we find merit in appellant's contention that the trial court erred in failing to properly credit him for pretrial incarceration and thus we remand for resentencing.

## FACTS

### A. *The Tinker Robbery.*

On December 12, 1981, Charles Craig's Colt .38 Special was stolen from his room at the Desert Inn Hotel, located at Congress and I–10 in Tucson, Arizona. Craig had owned the weapon since 1968 and although it originally had a dark coating, the paint had worn off, exposing the metallic base, and the weapon appeared "shiny." In addition, Craig used a unique type of .38 caliber ammunition manufactured by the Federal Cartridge Corporation. Production of the particular brand of .38 caliber ammunition was discontinued by Federal in December 1975.

The following day, December 13, 1981, Tinker was in Tucson staying at the La Quinta Inn, located at St. Mary's Road and I–10, just four blocks north of the Desert Inn. At approximately 5:00 to 6:00 p.m., Tinker stepped out of his motel room on his way to meet some friends for dinner when he noted a Mexican male in his late teens leaning against the wall and "just standing there." Tinker began to head toward his Blazer, which was parked four or five parking spaces from his room, when he thought that the teen-ager might be waiting to break into a motel room crossed his mind. Tinker returned to his motel room, opening the door and pretending to talk to an imaginary person in the hopes of deterring the teen-ager from breaking into his room. Tinker then closed and locked the door and walked to his Blazer. After placing some items in the back of his Blazer, and as Tinker started toward the driver's side, he spotted two males running directly at him. One ran toward Tinker pointing a .32 or .38 caliber revolver at Tinker's head. The other ran out and around to Tinker's left. The armed individual said, "I want your wallet, give me your money" and then exclaimed, "This is a real gun." When Tinker began to reach for his wallet the individual told him to get on the ground face down. Tinker did so, removing his wallet as he lay on the pavement and placing the wallet by his head. The second person approached Tinker from behind and the armed person instructed his accomplice to check Tinker's pockets. Tinker then heard a loud bang and felt a tremendous pain in his head. He heard the two persons running off and reached up and grabbed his head, discovering that his hand was covered with blood. Apparently, the armed individual hit Tinker on the head with the handgun and the handgun went off, striking Tinker in the stomach. The bullet removed from Tink-

er's abdomen was a .38 caliber slug identical to the unique Federal ammunition in Craig's .38 caliber Colt revolver.

### B. *The Wong Murder.*

At approximately 9:00 a.m. on December 14, 1981, the day after the assault and robbery of Tinker, an assailant entered the H W Market near Tucson High School. The assailant shot and killed Julie Wong, a 67 year-old woman who was one of the owners of the store. Police arriving on the scene found Wong, who had been shot through the left eye, lying on the floor near the front counter of the store. A television located in the back of the store was on, as was a sewing machine near it. The drawer to the cash register was open and contained only change. Later, during an autopsy, a bullet lodged in Wong's head was removed and preserved for evidence.

The police connected the Tinker and Wong crimes through ballistic analysis, which revealed that the unusual bullets removed from the victim's bodies probably came from the same Colt .38 or .38 Special revolver. Analysis also revealed that the fired bullets had characteristics similar to those which had been stolen from Charles Craig at the Desert Inn. However, no matching gun was ever found.

### C. *Appellant's In–Custody Statements.*

On April 4, 1984, nearly two and one-half years later, appellant was arrested in Benson, Arizona, and incarcerated in the county jail in Bisbee. While being booked into the jail, appellant was described as not in control of himself and appeared to be out of touch with reality. He created quite a disturbance in the booking area. At the outset of his stay in the Cochise County Jail he engaged in self-abusive behavior, at times banging his head against the cell bars or masturbating for days on end. Out of concern for appellant, the jail personnel contacted Jeanette Cousey, clinical director for the Cochise County Counseling Service Office. The office was not affiliated with either the jail or the Cochise County Sheriff's Department but was a separate entity that contracted with the county to provide psychiatric evaluation and services for Cochise County Jail inmates.

On April 11, 1984, Cousey met with appellant and conducted an interview and assessment of appellant's psychological well-being. After the interview, Cousey conferred with a psychiatrist, Dr. Eli Hyman and, as a result, Dr. Hyman prescribed the anti-psychotic medication Haldol. Haldol enables the mind to restore itself to normal thinking patterns. Dr. Hyman also prescribed another medication to offset the possible side effects of Haldol. Following his treatment, appellant's behavior and psychological condition improved dramatically between April 11 and April 17.

In the afternoon of April 17, Cochise County Sheriff's Department detention officer Jack Willick was making his rounds at the jail when appellant stopped him and asked if he could make a telephone call. Willick permitted appellant to make the call. After appellant completed this call, Willick escorted him back to his cell. En route, Willick sensed that appellant had something on his mind and asked appellant if there was something he would like to talk about. Appellant said no. Willick said that if he changed his mind to just send word and he would return to talk.

About two hours later Willick heard a voice calling out for the detention officer. He and another officer went up to the second floor of the jail and as they passed appellant's cell, appellant told Willick he wanted to talk to him. Willick walked to appellant's cell and appellant stated that he had done "a very terrible thing and it was bothering his conscience, he wanted to tell somebody." Appellant told Willick that he had killed a Chinese woman in an armed robbery. Willick asked appellant if he desired to speak to inmate counselor Nancy Kritchley. Receiving an affirmative response, Willick and another officer took appellant to the office and Willick contacted Kritchley. Appellant was brought to Kritchley's office and the two spoke in private. Appellant appeared somewhat anxious but was very well-oriented to reality. He told Kritchley that he needed to confess he had murdered a lady. Kritchley

explained to appellant that although she was a counselor and would attempt to help him, if he spoke of any criminal activity she would have to tell the police. Appellant then asked to speak to a police officer.

Kritchley told the detention officer to ask sheriff detective Frank Martinez to come to her office. Martinez did so and read appellant his constitutional rights from a rights card, stopping to explain each constitutional right to appellant. After Martinez finished reading appellant his rights, appellant became visibly upset and invoked his Miranda rights by saying, "I don't want to say anything now." Martinez honored appellant's invocation of rights and immediately left the room. Shortly thereafter, however, appellant asked Kritchley to summon Martinez again, which she did. After observing appellant exercise his rights, Kritchley came to believe that he did indeed understand them. When Martinez returned, he again informed appellant of his Miranda rights and Kritchley again explained the rights to appellant. Appellant again acknowledged that he understood his rights. Kritchley left the office after making sure that appellant thoroughly understood and had waived his constitutional rights.

Appellant then told Martinez that he had shot "an elderly lady, possibly oriental" at the "CW Market" near Tucson High with a .38 caliber Special because she tried to stop him from leaving the store. He said he threw the gun into the Santa Cruz River but then told Martinez that he sold it to a friend. During his conversation with Martinez, appellant displayed no unusual or abnormal behavior.

After speaking with appellant, Martinez contacted the homicide division of the Tucson Police Department and two to four hours later Detectives Edward Gonzales and Perry Lowe arrived at the Cochise County Jail. Martinez introduced Gonzales and Lowe to appellant and left the room. The detectives then took a taped statement from appellant. Appellant told the detectives that he went to a food store near Tucson High in the morning and a woman, who had been in the back room watching television, walked out from the back, whereupon he pulled out a gun he had previously stolen from a room at the Desert Inn and told her to put the money in the bag. The woman, who appellant said could have been Chinese, refused to comply with his demand and began to approach appellant. Appellant stated that he felt trapped and tense. He put the gun in the air and the woman backed away and went back behind the counter. Then he closed his eyes and shot her. During the course of the interview appellant acknowledged that he knew exactly what he was telling the detectives and understood what they were asking him. Throughout the interview appellant exhibited no inappropriate behavior and appeared to fully understand the detectives' questions and responses.

In June and October 1984, Dr. Edward Gelardin, a psychiatrist, met with appellant to conduct a psychological evaluation. On both occasions, Dr. Gelardin saw nothing unusual about appellant's behavior and noted that appellant was well-oriented to reality. Dr. Gelardin diagnosed appellant as suffering from schizophrenia or an organic mental syndrome when he was booked into the Cochise County Jail on October 4, 1984. Dr. Gelardin noted that appellant's treatment with Haldol appeared to restore normal thinking patterns. Dr. Gelardin reviewed and listened to the tape recording of appellant's April 17, 1984, statement to Gonzales and Lowe and reviewed a copy of the written transcript. Dr. Gelardin found that appellant appeared to comprehend what he was discussing with the detectives and exhibited no signs of suffering from delusions or hallucinations.

D. *Voluntariness of Appellant's Statements.*

Appellant contends that the trial court erred in not suppressing his statements to Kritchley and the detectives from Tucson because they were involuntarily made due to forced medication and because they were taken in violation of his fifth amendment right to counsel. Appellant recognizes that the Arizona Supreme Court in *Bravo I* ruled that the statements and the waiver of his Miranda rights were voluntary and not

the product of Haldol. However, he points out that in *Bravo I* he asserted only federal constitutional grounds and did not assert state constitutional grounds. He also now asserts an additional ground not urged in *Bravo I*, the contention that his Miranda rights were violated when he was interrogated after he called Martinez back to talk to him.

As far as the forced medication issue is concerned, it is clear that the law of the case doctrine precludes relitigation of the matter. See *Stearns–Roger Corp. v. Hartford Accident & Indemnity Co.*, 117 Ariz. 132, 134, 571 P.2d 278, 280 (App.1976), vacated on other grounds, 117 Ariz. 162, 571 P.2d 659 (1977); see *Black's Law Dictionary* 798 (5th ed. 1979).

■ As for the other reasons appellant asserts in attacking the voluntariness of his statements, they were never asserted in the retrial. Not only did appellant fail to object to the introduction of the statements, but his counsel affirmatively stated that he was not attacking the voluntariness of these statements. A defendant has a constitutional right to object to the use of his confessions and to have a hearing on the issue of voluntariness. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Having failed to object, no voluntariness hearing was necessary and appellant waived any objection to the admission of his statements. *State v. Fayle*, 134 Ariz. 565, 658 P.2d 218 (App.1982).

In any event, sections 4 and 10 of article 2 of the Arizona Constitution, which provide for due process and prohibit compelled self-incrimination, respectively, contain the same provisions as found in the fifth amendment to the United States Constitution. We see no reason why there should be a different result under the Arizona Constitution.

■ Furthermore, appellant's fifth amendment rights were not violated when he asked to speak to Martinez again after he had invoked his Miranda rights. A defendant can waive his fifth amendment protection after counsel has been requested if he has initiated the conversation or discussion with the authorities. *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

### DOUBLE JEOPARDY

Because the jury in the first trial acquitted him of the armed robbery charges, appellant contends the trial court erred in refusing to dismiss the first-degree murder charge which was based on the felony-murder rule.

In the retrial the same conduct which was used to try to establish appellant's guilt of armed robbery was used again. However, instead of armed robbery, the state contended the underlying felony was burglary. Relying on *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), appellant contends dismissal on double jeopardy grounds was mandated. We do not agree.

■ In *Grady v. Corbin*, supra, the court held that the double jeopardy clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted. It has long been settled that the double jeopardy clause is a general prohibition against excessive prosecution and does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside by way of direct appeal or collateral attack. *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 289, 102 L.Ed.2d 265, 272 (1988). There is nothing in *Grady* which indicates that the U.S. Supreme Court has overruled this long-settled rule.

■ This brings us to the question of whether the jury in the first trial could convict the defendant of first-degree murder under the felony-murder rule and yet acquit him of the underlying felony charged in a separate count on the same indictment. Prior to 1969 the answer was clearly "no." In *State v. Fling*, 69 Ariz. 94, 210 P.2d 221 (1949) and *State v. Laney*,

78 Ariz. 19, 274 P.2d 838 (1954), the court held that where the verdict acquitting the accused on one count tends to negate the existence of an element essential to the proof of the crime charged in another count on which he was convicted, the conviction cannot stand. This rule was changed in *State v. Zakhar,* 105 Ariz. 31, 459 P.2d 83 (1969). In *Zakhar,* the court overruled *Fling* and *Laney* holding that consistency between the verdicts on several counts of an indictment is unnecessary. The court relied on *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), quoting the following portion of that case in which Mr. Justice Holmes said:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were exposed through lenity.

*State v. Zakhar,* 105 Ariz. at 32, 459 P.2d at 84. The *Zakhar* court itself observed:

> It is well-known that in the privacy of the jury room, instructions are not always understood and followed. Compromises are made. The jury in the instant case could have found defendant guilty on two counts and at the same time decided that two convictions were enough and that he should be acquitted of the other two counts.
>
> If leniency or compromise led the jury to determine that they should acquit defendant on the charge of assault, then it is obvious they did not intend the acquittal to mean that the prosecuting witness consented to the indecencies that were committed against her. Had the jury thought that its exercise of mercy would provide defendant with a basis for claiming that he could not be sentenced for the crimes of which he was found guilty, it is quite possible that there would have been guilty verdicts on all four charges.

*Id.,* at 32–33, 459 P.2d at 84–85. Thus, the result here is that the conviction in the first trial for first-degree murder would have stood if it had not been reversed on appeal because the jury did not, by its acquittal of the armed robbery charge, intend to acquit appellant of first-degree murder under the felony-murder rule. Instead, the jury was exercising its mercy or lenity. Since appellant has not been acquitted of the felonious conduct in the first-degree murder case and since the conviction for first-degree murder has been reversed, he can be retried for first-degree murder under the felony-murder rule.

## THE MOTION TO SEVER

Appellant timely moved under Ariz. R.Crim.P. 13.4, 17 A.R.S., to sever the Tinker robbery case from the Wong murder. His motions were denied. He contends he was entitled to a severance as a matter of right and that he was prejudiced by the "rub-off" effect of the evidence in the Tinker robbery.

■ Ariz.R.Crim.P. 13.3(a), 17 A.R.S., provides that offenses charged in separate proceedings may be joined if they "1) [a]re of the same or similar character; or 2) [a]re based on the same conduct or are otherwise connected together in their commission; or 3) [a]re alleged to have been a part of a common scheme or plan." The same criteria applies to consolidation. Ariz.R.Crim.P. 13.3(c), 17 A.R.S. A defendant is entitled to severance as a matter of right if they are only joined by virtue of the fact that they are of the same or similar character. *State v. Sustaita,* 119 Ariz. 583, 583 P.2d 239, vacated on other grounds, 119 Ariz. 600, 583 P.2d 256 (1978); Ariz.R.Crim.P. 13.4, 17 A.R.S.

■ The state argues that the joinder was proper because the offenses were part of a common plan or scheme and because they were connected together in their commission. The test used to determine whether crimes may be classified as a common plan or scheme under Rule 13.3(a)(3) is not whether they were perpetrated in an identical manner, but whether the court perceives a visual connection between the crimes. *State v. Day,* 148 Ariz. 490, 715 P.2d 743 (1986). The visual connection is

made when similarities exist where one would ordinarily expect differences. *Id.* "However, [the court] must examine not only the similarities, but also the differences between alleged acts, since the rules on joinder and severance are intended to further not only liberal joinder but liberal severance." *Id.*, 148 Ariz. at 493–94, 715 P.2d at 746–47. The only similarities between the two acts is that they both involved a robbery and the same weapon was used to commit both crimes. The differences are striking. The Tinker crime involved an attempted robbery in the parking lot of a motel. There were two persons present, and the weapon apparently discharged accidentally. The Wong murder took place inside a small grocery store, only one person was involved, and there was no evidence of any accidental discharge of the weapon. We conclude they were not properly joined as part of a common scheme or plan.

■ The state also contends that if the offenses were not properly joined as a common scheme or plan, they were properly joined because they were connected together in their commission. Joinder is permissible under Ariz.R.Crim.P. 13.3(a), 17 A.R.S., as being otherwise connected together in their commission where the offenses arose out of a series of connected acts, and the evidence as to each count, of necessity, overlaps; where most of the evidence admissible in proof of one offense is also admissible in proof of the other; or where there are common elements of proof in the joined offenses. *State v. Martinez–Villareal,* 145 Ariz. 441, 702 P.2d 670, cert. denied, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985).

■ Here, the bulk of the evidence relating to the murder consisted of appellant's statements made in the Cochise County Jail and all the evidence surrounding the making of such statements, the testimony of the ballistics expert and the testimony of a representative from the Federal Cartridge Corporation, which was all admissible in the Tinker case. We conclude that the trial court did not err in denying the motion to sever.

## THE ALLEGED SENTENCING ERROR

Following his first trial, appellant was sentenced to concurrent 12–year prison terms on each of the Tinker counts and sentenced to a consecutive term of life imprisonment for the murder of Julie Wong. He was given full credit for the presentence incarceration up to the time of sentencing on the Tinker counts. Appellant then began serving his concurrent 12–year sentences for the Tinker convictions while he appealed his convictions to the Arizona Supreme Court. On September 20, 1988, the supreme court reversed appellant's convictions on both the Tinker and Wong counts, remanding for a new trial. When it came time for sentencing, because he had been acquitted of the Tinker charges, appellant asked the court to credit his pretrial incarceration, which he contended was 2,148 days, against the murder conviction. The trial court, noting that he had already been credited for the presentence incarceration on the Tinker counts, only gave appellant credit from the date of the supreme court decision reversing his convictions to the date of sentencing. Appellant contends this was erroneous. We agree.

■ A.R.S. § 13–709 provides, in pertinent part:

A. A sentence of imprisonment commences when sentence is imposed if the defendant is in custody or surrenders into custody at that time. Otherwise it commences when the defendant becomes actually in custody.

B. All time actually spent in custody pursuant to an offense until the prisoner is sentenced to imprisonment for such offense shall be credited against the term of imprisonment otherwise provided for by this chapter.

C. If a sentence of imprisonment is vacated and a new sentence is imposed on the defendant for the same offense, the new sentence is calculated as if it had commenced at the time the vacated sentence was imposed, and all time served under the vacated sentence shall be credited against the new sentence.

The state argues that A.R.S. § 13–709(C) requires that credit for a vacated sentence be given for a new sentence imposed for the same conviction and that once such credit is given, it may not be given on other consecutive sentences. In support of this proposition the state cites *State v. Cuen*, 158 Ariz. 86, 761 P.2d 160 (App.1988).

*Cuen* is factually distinguishable. Furthermore, A.R.S. § 13–709(c) does not fit the fact situation here and presumes convictions of two crimes with a consecutive sentence on the second crime. In this case appellant never received any benefit from the time credited on the Tinker counts. The result is as if the Tinker counts had never existed and he should be given credit commencing with the first day that he was incarcerated on the Wong murder charge.

The conviction is affirmed but the sentence is vacated and this matter is remanded for resentencing.

LIVERMORE, C.J., and LACAGNINA, P.J., concur.