904 P.2d 437

STATE of Arizona, Appellee,

v.

Aryon WILLIAMS, Appellant.

No. CR–93–0138–AP.

Supreme Court of Arizona,
En Banc.

Sept. 26, 1995.

Grant Woods, Attorney General by Paul J. McMurdie, Dawn M. Northup, Phoenix, for Appellee.

Harriette P. Levitt, Tucson, for Appellant.

MOELLER, Vice Chief Justice.

In one case, appellant Aryon Williams ("defendant") was charged with first degree murder. In another, he was charged with attempted first degree murder and armed robbery. The trial court consolidated the two cases for trial, and the jury found defendant guilty of all three offenses. Defendant was sentenced to death for first degree murder and to concurrent terms of imprisonment for armed robbery and attempted murder. This is defendant's automatic, direct appeal. *See* Ariz.R.Crim.P. 31.2(b); Ariz.Rev.Stat. Ann. (A.R.S.) §§ 13–4031, 13–4035 (1989). Defendant did not separately appeal the noncapital convictions and sentences and presents no independent issues concerning them, although we have reviewed them for fundamental error. For reasons discussed below, we affirm defendant's convictions and sentences.

## FACTS

*First Degree Murder of Rita.* Defendant was convicted of murdering his former girlfriend, Rita DeLao. Although defendant and Rita were separated, they had a son together ("little Aryon") and maintained a close relationship. On Saturday, January 27, 1990, defendant and Rita spent part of the day together and made plans for Rita to spend

the night at defendant's apartment in Casa Grande. Defendant lived in the apartment with his current girlfriend, Michelle Deloney, but he told Michelle to spend Saturday night somewhere else. Defendant left Rita at his parents' house in Eloy on Saturday afternoon, expecting her to come to his apartment later that evening. Sometime after midnight, Rita telephoned defendant at his apartment and said that she wanted to come over. Michelle, however, was there, so defendant told Rita not to come. Rita called a second time and said that she was coming over. Rita appeared at defendant's apartment at about 3:00 a.m. Defendant went outside to talk to Rita, and they had an argument. When Rita confronted defendant with a gun, defendant knocked her down and disarmed her. She hit her head against a concrete sidewalk. Defendant went into the apartment, got a glass of water and his keys, and then left the apartment. He later told his family that the water was to clean up Rita's blood.

When defendant returned to his apartment several hours later at about 7:00 or 8:00 that same morning he was wearing different clothes. He told Michelle that he had burned the clothes and shoes that he had been wearing. Michelle found Rita's shoes on the kitchen floor, but later that day noticed that they were gone.

That same day at about 8:30 to 9:00 a.m., a hunter discovered Rita's body on a dirt road in Arizona City, about a twenty-minute drive from defendant's apartment. Rita had been shot once in the elbow and twice in the thigh, fracturing her femur. She had sustained multiple blunt force injuries including scrapes, bruises, and torn skin on her face, head, chest, abdomen, arms, shoulders, and back. She also had severe internal injuries, including multiple fractured ribs, a fractured breast bone, fractured collar bones, and massive fractures of the pelvic bone. Rita's lungs, liver, spleen, and bladder were torn, and there was a small amount of blood at the base of the brain, likely caused by injuries to the chest. She had been dragged by her heels or legs, and her injuries and tire tracks across her abdomen indicated that she had been run over by an automobile.

Rita's death was caused by multiple gunshot wounds associated with multiple fractures and internal injuries due to blunt force trauma. Although the medical examiner could not determine the sequence of all the injuries, he did determine that the injuries inflicted by the automobile occurred after a dramatic decrease in blood pressure, indicating that Rita was severely injured before being run over. Bullets recovered from the wounds and a firing pin found at the scene were consistent with the .32 caliber gun that defendant had taken from Rita earlier that morning. Police also recovered a metal spring and pieces of a steam iron at the scene.

When Rita did not show up for work that morning, her employer called her mother. Unaware of Rita's whereabouts, Rita's mother called defendant's mother and then later went with Rita's brother to speak to defendant at his parents' home in Eloy. Defendant told them that he had seen Rita, but that she had left Casa Grande at about 2:00 that morning to return to her apartment in Phoenix. Defendant then started laughing and told Rita's family that they would never find her and that he would give them a week and a half to find her before he took custody of little Aryon. Defendant told them that he would do anything to get custody of his son, even if he had to shoot or "beat the heck out of" someone to do it.

The next morning, Monday, January 29, 1990, defendant told Michelle that some of his friends had killed Rita. He told Michelle that he was present during the killing, but had only kicked Rita in the face. Defendant then drove Michelle to Rita's car, which was parked near a baseball field about seven-tenths of a mile from their apartment. As defendant approached the car, a Pinal County Sheriff's evidence technician who was processing the car stopped him. Defendant told the technician that he thought the car was Rita's and that if he were allowed to look inside the car, he could confirm his belief. He also told the technician that Rita was from Phoenix and that he had last seen her on Sunday morning at about 3:10 or 3:15 a.m.

Defendant later went to the Casa Grande Police Department to inquire about Rita. At

the department, Detective Wesbrock of the Pinal County Sheriff's Office interviewed defendant and told him that Rita was dead. After the interview, Wesbrock went with defendant to defendant's apartment. While at the apartment, Detective Wesbrock had a brief discussion with Michelle, who told him that defendant was home with her on the night of the murder. After obtaining written consent from both defendant and Michelle, Detective Wesbrock examined defendant's .45 caliber automatic handgun. He also searched defendant's drawers and closet and seized all the clothing defendant had worn the previous week. Shortly after Wesbrock left, defendant told Michelle that the police would find his fingerprints on Rita's car because he had been with Rita the night before. He also told Michelle that she should continue to tell police that he was home with her all night.

Police did find defendant's fingerprints on several different surfaces on the exterior of Rita's car. They also found various stains resembling blood on the interior and exterior of the vehicle, including dark stains in the splash area near the tire well and on the wheel cover. A large stain on the emergency brake console was blood with the same type and enzyme markers as Rita's. Several of the other stains were human blood, but criminalists were unable to determine the type. There were traces of human blood on the left rear quarter panel, the left front spoiler, the splash area behind the left rear wheel, the left rear panel molding, and on several locations on the underside of the car. Inside the car, in addition to the stain on the emergency brake console, there was human blood on the driver's door and on the driver's seat.

About two weeks after Rita's murder, defendant admitted to Michelle that he had in fact killed Rita. He told Michelle that he shot Rita in the arm and in the side and that he hit her in the head with a steam iron and a pole. He told Michelle that when Rita tried to get up and run, he knocked her down and repeatedly ran over her with a car. Defendant finally told Michelle that if she told anyone, "he would do his 25 years and he would get out and he would kill [her] if he had to go through [her] entire family to do

it." Defendant also shared details of Rita's murder with two of his co-workers, but did not admit to them his involvement.

*Armed Robbery and Attempted First Degree Murder of Norma.* In the early hours of March 5, 1990, five weeks after Rita's murder, defendant entered a Circle K convenience store and asked the cashier, Norma Soto, where her boyfriend was. Defendant knew both Norma and her boyfriend. Norma told defendant where her boyfriend was, and defendant left. About an hour later, at around 2:20 a.m., defendant returned. He had a gun and appeared upset and angry. Defendant accused Norma of spreading rumors that he had killed Rita and asked her for the money in the register. While she was handing defendant the money, defendant told her to get in his car so they could go to the desert and talk. When Norma refused, defendant said that he would give her to the count of three to get in the car. Norma started to cry and begged defendant not to hurt her. Defendant fired, hitting Norma in the forehead, abdomen, and left hand.

At approximately 2:45 a.m., Officer Fortier of the Eloy Police Department drove by the store on a routine security check and noticed the front doors standing open. Thinking this unusual, he went inside. When he did not see the clerk, he went to the counter and saw the registers standing open. He then saw a trail of blood, followed it, and found Norma sitting in the manager's office covered with blood, holding a rag over her stomach. After calling for help, he asked Norma what happened, and she said that Aryon Williams had robbed her. She said initially that she did not know who shot her, but while waiting for the ambulance she repeatedly said, "Aryon shot me." Norma also told paramedics and a Pinal County Sheriff's deputy that Aryon Williams had shot her. At the scene, police recovered three .45 caliber bullet casings that were later determined to have been fired from defendant's gun. Approximately seventy-seven dollars was missing from the store.

Norma arrived at the emergency room at 3:57 a.m. A nurse asked Norma who shot her, and Norma responded "John B. Dixon did it . . . it was a robbery. He works with me." Nurse Contini reported to Officer John

Jensen that "John B. Dixon" was involved in Norma's shooting. Jensen interviewed Norma in the intensive care unit. Norma had an endotracheal tube inserted down her throat and thus could not talk, but with the help of a nurse, Jensen was able to interview her through a series of questions to which Norma responded by nodding or shaking her head. Norma told Jensen that she did not know who shot her, but denied that it was her co-worker John Bendixon who had robbed her.

Officer Jensen then had Norma spell out the name of her assailant by nodding yes at the appropriate letter as he said the alphabet aloud. She spelled out A–R–R–O–N W–I–L–L–I–A–M–S. After spelling out defendant's name, Norma told Jensen, again through a series of yes-or-no questions, that defendant had robbed her, that defendant had pointed a gun at her, that she did not know who shot her, and that she did not remember being shot. Norma confirmed in a later statement to police that defendant had robbed her, that he had accused her of spreading rumors, that he had pulled a gun on her, and that he was the only one around during the robbery. Doctors removed from Norma's abdomen a .45 caliber bullet that was later identified as having been fired by defendant's gun.

At about 8:15 a.m. on the morning of the shooting and robbery of Norma, defendant's mother called Michelle and told her that the police were looking for defendant and that Norma had accused defendant of shooting her. When Michelle reported this to defendant, he "jumped straight up off the floor." He denied involvement, but stated that his friends had done it. Defendant then gave Michelle his gun and eighty dollars in cash and told her to leave and not come back. He told her to hide the gun, but not throw it away.

Shortly thereafter, police stopped Michelle while driving and recovered the gun from her car. The police took Michelle to the Casa Grande Police Department where Detective Wilhite of the Eloy Police Department and Detective Eck of the Pinal County Sheriff's Office interviewed her. During the interview, Michelle gave police the money that defendant had given her, implicated defendant in Rita's murder, and admitted that she had earlier lied when she told Detective Wesbrock that defendant was home with her on the night of Rita's murder.

Police arrested defendant, who told Detective Wilhite that, although he owned a gun, he had loaned it to somebody who had not returned it. When defendant found out that the police had his gun, he admitted that he was lying, but denied involvement in the robbery of Norma.

## PROCEDURAL HISTORY

Defendant was indicted for armed robbery and attempted murder of Norma and, several months later, was separately indicted for the first degree murder of Rita. The trial court, on motion of the state and over defendant's objection, consolidated the two cases for trial. At trial, the state relied primarily on defendant's admissions to Michelle and others and on physical evidence to prove the murder of Rita. The trial court also admitted evidence that on separate occasions prior to the murder, defendant had burned Rita's car, slashed her tires, and shot at her apartment. To prove the crimes against Norma, the state relied primarily on physical evidence and on Norma's testimony and statements to others identifying defendant as her assailant.

Defendant testified on his own behalf and offered an alibi defense for each crime. He admitted arguing with Rita in the early morning hours of January 28, 1990, but denied any involvement in her murder. To explain how Rita had been shot with what appeared to be her own gun after he had taken it from her, defendant testified that he gave the loaded gun back to Rita shortly after disarming her. With regard to the armed robbery/attempted murder of Norma, he admitted going once to the Circle K and talking to Norma that night, but testified that at the time of the shooting, he was at his parents' home with his brother. To explain the evidence showing that his gun fired the shots that hit Norma, he testified that he spent part of that particular evening with two friends, that he inadvertently left his gun in their car, and that they returned the gun to him sometime shortly after the time of the

shooting. According to defendant, his friends told him that they had fired the gun, but they did not say where.

The jurors returned guilty verdicts on all counts. At sentencing on the murder count, the court found two statutory aggravating factors: (1) defendant was previously convicted of a felony involving the use or threat of violence (the armed robbery/attempted murder of Norma), see A.R.S. § 13–703(F)(2) (1989); and (2) defendant committed the murder of Rita in an especially heinous, cruel, or depraved manner, see A.R.S. § 13–703(F)(6) (1989). The trial court found no statutory mitigating factors, but found as nonstatutory mitigation that defendant had no criminal record prior to the murder and that defendant had in the past displayed good conduct and character. Concluding that the mitigating evidence was not sufficient to invoke leniency, the trial court sentenced defendant to death.

### ISSUES

Defendant raises six trial issues and four sentencing issues.

The trial issues are:

1. Whether the trial court erred by consolidating the two cases for trial;

2. Whether the trial court should have excluded evidence of defendant's prior bad acts against Rita;

3. Whether the trial court should have granted a mistrial after Michelle Deloney testified concerning defendant's prior bad acts because the state did not disclose that she would so testify;

4. Whether preindictment delay denied defendant his right to a speedy trial or due process;

5. Whether the trial court erred by allowing the state two investigative witnesses;

6. Whether the trial court should have allowed into evidence an out-of-court statement by defendant as a prior consistent statement.

The sentencing issues are:

1. Whether the trial court should have authorized funds for a presentence diagnostic mental health exam;

2. Whether the trial court properly imposed a sentence of death;

3. Whether victim recommendations of the appropriate sentence violated defendant's constitutional rights;

4. Whether Arizona's death penalty statute is constitutional.

### DISCUSSION

### I. TRIAL ISSUES

#### A. Consolidation of the Cases

Defendant argues that the trial court should not have consolidated the armed robbery/attempted murder case with the murder case. Rule 13.3(a), Arizona Rules of Criminal Procedure, allows joinder of offenses in an indictment, information, or complaint if they: ·(1) are of the same or similar character; (2) are based on the same conduct or are otherwise connected together in their commission; or (3) are alleged to have been a part of a common scheme or plan. If the offenses fit into one or more of these categories, Rule 13.3(c) authorizes consolidation of separately charged cases in whole or in part "provided that the ends of justice will not be defeated thereby." *State v. Martinez–Villareal,* 145 Ariz. 441, 445, 702 P.2d 670, 674, *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). We hold that the cases were properly consolidated as "otherwise connected together in their commission" within the meaning of Rule 13.3(a)(2).

Offenses may be joined as otherwise connected in their commission where, among other things, most of the evidence admissible in proof of one offense is also admissible in proof of the other. *Martinez–Villareal,* 145 Ariz. at 446, 702 P.2d at 675. In this case, most of the evidence was admissible to prove either crime. With regard to the murder case, evidence of the armed robbery/attempted murder was relevant and admissible for two purposes. First, it was relevant to show defendant's consciousness of guilt and thus his identity as Rita's killer. Evidence that a criminal defendant sought to suppress evidence adversely affecting him is relevant to show a consciousness of guilt. *State v. Settle,* 111 Ariz. 394, 396, 531 P.2d 151, 153 (1975); *see also State v. Haymon,* 616 S.W.2d 805,

806–07 (Mo.) (holding that defendant's attempt to shoot a witness is relevant to show consciousness of guilt or desire to conceal the crime), *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981); *cf. State v. Bible,* 175 Ariz. 549, 592, 858 P.2d 1152, 1195 (1993) ("Evidence of flight from, or concealment of, a crime usually constitutes an admission by conduct."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

According to defendant's own statement, he shot Norma at least in part because he believed she was implicating him in Rita's murder. From this the jury reasonably could infer that defendant shot Norma to attempt to silence her, thus making evidence of the shooting legally relevant to the murder. *See Settle,* 111 Ariz. at 396, 531 P.2d at 153 (holding that evidence that the defendant sought to silence a witness was relevant to show consciousness of guilt). We recognize that there are other possible reasons why defendant might have shot Norma, *e.g.,* to further the robbery or simply to silence false rumors. The possible alternative explanations for the shooting, however, go to the weight of the evidence, not to its admissibility. *State v. Jeffers,* 135 Ariz. 404, 415, 661 P.2d 1105, 1116 (holding evidence of an attempted pretrial escape from jail relevant to show consciousness of guilt, even though there were other explanations for the escape), *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

■ Second, evidence of the armed robbery was admissible to support the credibility of one of the state's witnesses, Michelle. "Evidence which tests, sustains, or impeaches the credibility or character of a witness is generally admissible," even if it refers to a defendant's prior bad acts. *Id.* at 417, 661 P.2d at 1118. When the police first interviewed Michelle, she told them that defendant was home with her at the time of the murder. It was not until after Norma's shooting that she told police that defendant had admitted to her that he had killed Rita. To explain her inconsistent statements, Michelle testified that she initially lied on defendant's behalf because she was afraid of defendant and because defendant had threatened her. She implicated defendant after his arrest for Norma's shooting because she feared that if defendant was released from jail, he would try to kill her next. Evidence of defendant's threats and the event that finally motivated Michelle to implicate him—the attempt to kill Norma—tended to explain Michelle's behavior and the change in her story. Because evidence of the attempted murder supports Michelle's credibility as a witness, it was relevant to the murder case.

■ Conversely, although no separate challenge is made on the noncapital counts, we note that evidence of Rita's murder was also relevant to show defendant's motive for shooting Norma. Although motive is not an element of a crime, a trial court may admit evidence of a defendant's other misconduct if the misconduct furnished or supplied the motive for the charged crime. Ariz.R.Evid. 404(b) (allowing other acts evidence to show motive); Edward J. Imwinkelried, *Uncharged Misconduct Evidence* §§ 3:15–3:16 (1984 & Supp.1995); *see Douglass v. State,* 44 Ariz. 84, 88–89, 33 P.2d 985, 987 (1934) (holding that evidence of a prior murder was relevant to show a motive of concealment in the charged murder). For example, in *United States v. Benton,* there was evidence that the defendant feared that a former associate would implicate him in several murders. 637 F.2d 1052, 1055 (5th Cir.1981). When the defendant was tried for murdering the former associate, the court properly admitted evidence of the prior murders to show that defendant's motive in the charged murder was to silence the victim. *Id.* at 1056–57.

Here there is evidence, in the form of defendant's own statement made in the course of the attempted murder, that defendant believed Norma had implicated him in Rita's murder. Like *Benton,* proof of the murder tended to prove that a desire to silence Norma motivated defendant to shoot her. Offered for this purpose, evidence of Rita's murder was admissible in the attempted murder case.

Because of the link between these two crimes, evidence admissible to prove one was also admissible to prove the other. Defendant argues, nonetheless, that the cases still should not have been consolidated because the overlap in evidence would have been

minimal. We disagree. In order for the attempted murder of Norma to be relevant to defendant's murder case, the state had to introduce evidence sufficient to show that it was defendant who shot Norma. Similarly, for the murder of Rita to be relevant to the robbery and attempted murder of Norma, the state had to show it was defendant who murdered Rita. *See State v. Schurz,* 176 Ariz. 46, 51–52, 859 P.2d 156, 161–62 (for evidence of a separate robbery to be admissible to prove murder, evidence must be sufficient to find that a robbery took place and that defendant committed it), *cert. denied,* —— U.S. ——, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993). Given the required showing, the bulk of the state's case on either crime was necessarily admissible in the case on the other.

■ Thus, most of the evidence was admissible to prove both cases. Consolidation is typically appropriate under these circumstances. *E.g., Martinez–Villareal,* 145 Ariz. at 445–46, 702 P.2d at 674–75 (holding that separate burglary and murder cases were properly consolidated for trial where evidence of the burglary was also admissible in the murder case); *State v. Bravo,* 171 Ariz. 132, 139, 829 P.2d 322, 329 (App.1991) (holding that separate murder and robbery cases were properly consolidated where the bulk of the evidence of the murder was also admissible in the robbery case); *see also Commonwealth v. Jervis,* 368 Mass. 638, 335 N.E.2d 356, 361 (1975) (holding that automobile theft and attempted murder cases were properly consolidated where evidence of the theft was also admissible in the attempted murder case).

Moreover, the trial court instructed the jury that it should decide each count separately and that the state had to prove every element of each charge beyond a reasonable doubt. *See State v. Atwood,* 171 Ariz. 576, 613, 832 P.2d 593, 630 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). Under these circumstances, we find no abuse of discretion in consolidating these two cases for trial.

**B.  Evidence of Prior Bad Acts**

■ During its case in chief, the state introduced evidence that defendant had on separate earlier occasions burned Rita's car, slashed her tires, and shot at her apartment. Defendant argues that the trial court abused its discretion in admitting this evidence. Four provisions in the rules of evidence protect a defendant from unfair prejudice resulting from evidence of prior bad acts: (1) the requirement of Rule 404(b) that the evidence be admitted for a proper purpose; (2) the relevancy requirement of Rule 402; (3) the trial court's discretion under Rule 403 to exclude evidence if the danger of unfair prejudice substantially outweighs the probative value; and (4) Rule 105's provision for an appropriate limiting instruction, if requested. *Atwood,* 171 Ariz. at 638, 832 P.2d at 655. We conclude that the other acts evidence offered here meets the requirements of these rules.

Under Rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove that behavior conforms to character. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *Schurz,* 176 Ariz. at 51, 859 P.2d at 161. The prior acts of aggression toward Rita's property, because they show defendant's animosity toward Rita, were admitted for the proper purpose of showing defendant's motive and intent. *See State v. Wood,* 180 Ariz. 53, 61–62, 881 P.2d 1158, 1166–67 (1994) (evidence of previous difficulties between the accused and the victim is admissible where premeditation is at issue), *cert. denied,* —— U.S. ——, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995); *State v. Sparks,* 147 Ariz. 51, 56, 708 P.2d 732, 737 (1985) (evidence that the defendant and the victim had an ongoing feud was admissible); *Jeffers,* 135 Ariz. at 418, 661 P.2d at 1119 (evidence of prior trouble between the victim and the accused tends to show malice, motive, or premeditation).

■ The evidence was also relevant under Rule 402. Arguing otherwise, defendant claims that the state did not produce evidence sufficient to show that he committed the acts. *See Schurz,* 176 Ariz. at 51–52, 859

P.2d at 161–62 (evidence of prior acts is relevant to the charged crime only if the acts actually occurred and only if defendant committed them); *see also* Ariz.R.Evid. 104(b) (admissibility of evidence whose relevance relies on a condition shall be admitted upon sufficient evidence that the condition was fulfilled). We conclude that the evidence was sufficient. Evidence whose relevancy depends on the fulfillment of a condition of fact is admissible when a jury could reasonably believe from the evidence that the condition was fulfilled. *See State v. Pleu,* 155 Ariz. 44, 49–50, 745 P.2d 102, 107–08 (1987); *State v. Romero,* 178 Ariz. 45, 51, 870 P.2d 1141, 1147 (App.1993); *see also Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) (holding that other act evidence is relevant under federal Rule 402, as enforced by Rule 104(b), if the jury can reasonably conclude from the evidence that the act occurred and that the defendant was the actor).

The jury here could reasonably have concluded from the evidence that defendant committed the prior acts. Defendant's girlfriend Michelle testified that defendant frequently expressed hostility toward Rita and that defendant told her that he had committed all three prior acts. Michelle also recalled an occasion when defendant left their apartment with a sawed-off shotgun and returned about one hour later. About five to ten minutes after defendant returned, defendant's mother called to say that Rita had called her accusing defendant of shooting at her apartment. Defendant also admitted to one co-worker that he had burned Rita's car and slashed her tires, and he admitted to a second co-worker that he had burned Rita's car and shot at her apartment. Based on this evidence, the state made an adequate showing that defendant committed the acts.

■ Defendant argues finally that even if the evidence was relevant for a proper purpose, the trial court should have excluded it because "[a]ny probative value would have been slight compared with the enormous prejudicial effect." *See* Ariz.R.Evid. 403. We disagree. As we have already concluded, the evidence was probative to show defendant's motive and intent. *See Sparks,* 147

Ariz. at 56, 708 P.2d at 737; *Jeffers,* 135 Ariz. at 418, 661 P.2d at 1119.

As for prejudice, defendant appears to offer two reasons why the evidence presented the danger of unfair prejudice. First, he argues that the state used the evidence to horrify and disgust the jury. *See Schurz,* 176 Ariz. at 52, 859 P.2d at 162 (evidence is unfairly prejudicial if it has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror). The nature of the evidence, however, does not support defendant's argument. The evidence of defendant's prior acts consisted of several admissions by defendant and of police officers and fire officials describing the damage done. Although it was damaging to defendant, it was neither horrifying nor disgusting.

Second, defendant argues that the state used the evidence to argue that defendant "would stop at nothing in his jealous need for total control over his child and the women in his life." In other words, the state used the evidence to illuminate defendant's motive, a proper purpose for other acts evidence under Rule 404(b). We see very little danger of unfair prejudice in the prior acts evidence admitted here. Accordingly, the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.

The other acts evidence admitted in defendant's case meets the requirements of the rules of evidence. Moreover, the trial court instructed the jury to consider the other acts evidence only for the proper purpose for which it was admitted. *See* Ariz.R.Evid. 105. There was no abuse of discretion.

## C. Rule 15 and Michelle's Testimony Regarding Defendant's Prior Acts

■ In addition to attacking the prior bad acts evidence under the rules of evidence, defendant also contends that, to the extent it came in through Michelle, it should have been excluded as a sanction for the state's alleged nondisclosure. Michelle testified that defendant told her that he committed all three alleged prior acts against Rita's property. She also gave other testimony tending to prove that defendant had shot at Rita's

apartment. Six days after Michelle's testimony, defendant moved for sanctions, including a mistrial, because the state had not disclosed that she would testify about defendant's prior acts. On appeal, defendant argues that the state violated Rule 15.1, Arizona Rules of Criminal Procedure, because it did not "disclose its intention to introduce any prior bad acts through Michelle Deloney."

■ Rule 15 imposes no such disclosure requirement. Rule 15.1(a)(1) requires the state to disclose the names of all witnesses together with their relevant written or recorded statements. Rule 15.1(a)(6) requires the state to disclose all prior acts of the defendant that will be used at trial. The state complied with both of these provisions in its first disclosure statement, identifying Michelle as a witness and listing the prior acts it intended to use. Defendant does not allege that Michelle gave any written or recorded statements that were not disclosed, and the rules do not require the state to explain how it "intends" to use each of its witnesses. *See State v. Wallen,* 114 Ariz. 355, 361, 560 P.2d 1262, 1268 (App.1977) ("The criminal discovery rules do not require the state to provide a word-by-word preview to defense counsel of the testimony of the state's witnesses.").

Defendant had full notice of the witnesses and the matters to which Michelle testified. He knew which alleged prior acts the state intended to use, and counsel was able to cross-examine Michelle regarding her testimony relating to the prior acts. Under these circumstances, the trial court properly denied the motion for mistrial or for other sanctions. *See id.* at 360–61, 560 P.2d at 1267–68 (holding that the trial court did not abuse its discretion when it denied sanctions after state's witness testified to matters previously undisclosed); *cf. State v. Hatton,* 116 Ariz. 142, 150, 568 P.2d 1040, 1048 (1977) (holding that listing the names of witnesses for use in the state's case-in-chief was adequate notice for the defendant to prepare for their testimony on rebuttal).

## D. Preindictment Delay

Defendant killed Rita on January 28, 1990. He was arrested on March 5, 1990 for the offenses against Norma. He was not indicted for Rita's murder until December 1990. He argues that the preindictment delay denied him his right to due process and his Sixth Amendment right to a speedy trial. Because defendant did not raise this issue below, he asks us to review it as a matter of fundamental error.

■ We find no error, let alone fundamental error. We note first that defendant's Sixth Amendment right to a speedy trial did not attach until defendant was indicted. *See United States v. Marion,* 404 U.S. 307, 313–15, 92 S.Ct. 455, 459–60, 30 L.Ed.2d 468 (1971). Thus, in terms of the Sixth Amendment, the preindictment delay is of no consequence.

■ For preindictment delay to violate due process, defendant must show (1) that the delay was intended to gain a tactical advantage or to harass him and (2) that the delay actually and substantially prejudiced him. *State v. Hall,* 129 Ariz. 589, 592–93, 633 P.2d 398, 401–02 (1981). Defendant has shown neither. The record does not show the reason or purpose for the delay. As for prejudice, defendant had ample time to prepare his defense. Defendant does not allege that the delay caused the loss of witnesses, the loss of evidence, or the loss of *anything* else that would have helped him.

## E. The State's Investigative Witnesses

■ Detective Wilhite of the Eloy City Police Department was the officer in charge of the attempted murder and armed robbery of Norma. Detective Tom Solis of the Pinal County Sheriff's Office was the officer in charge of Rita's murder. Both were expected to testify, and the court allowed them both to sit at counsel table throughout the trial. Defendant argues that this violated Rule 615, Arizona Rule of Evidence.

At the time of defendant's trial, Rule 615 provided:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other wit-

nesses.... This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative ..., or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Defendant argues that the rule by its language provides only for a "person" whose presence is shown to be essential, not a "person or persons." Thus, according to defendant, the court had the authority to allow either Detective Solis or Detective Wilhite, but not both, to remain throughout the trial.

■ Defendant reads the rule too narrowly. Under Rule of Criminal Procedure 9.3(d) and Rule of Evidence 615(2), the state is entitled to have one investigator present throughout trial, even though that person may testify. But any party may seek additional exemptions from the exclusion order by showing that the presence of an additional person or persons is essential to the presentation of the party's cause under Rule 615(3). *See United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir.1981) (allowing two DEA agents to remain at counsel table under Federal Rule of Evidence 615). Defendant particularly overemphasizes the singularity of the word "person" in Rule 615. Under the terms of the rule, if a party shows that a person's presence is essential to the presentation of its case, the court lacks authority under the rule to exclude that person from the trial. We take the rule to mean any person, not one person. *See id.* ("[T]he decision as to how many will be excused from sequestration is just as discretionary ... as who will be excused.").

■ The question then is whether the state made a sufficient showing that a second case agent was "essential to the presentation" of the state's case. We believe that it did. The trial involved cases that had been investigated by two separate law enforcement agencies. Each detective was in charge of his case, and each had unique areas of personal knowledge. Under these circumstances, the trial court did not abuse its discretion in allowing both to remain in the courtroom.

## F. Defendant's Out-of-Court Statement to Andrew Cass

■ Andrew Cass, one of defendant's coworkers, testified during defendant's case that he had spoken with defendant about the burning of Rita's car. When defense counsel asked, "And what did Aryon tell you about Rita['s] vehicle," the state objected on hearsay grounds. Defense counsel argued that the statement was admissible because it was offered for rebuttal and to prove the declarant's (defendant's) state of mind. The court sustained the objection. On appeal, defendant argues, for the first time, that the trial court should have allowed the out-of-court statement as a prior consistent statement. *See* Ariz.R.Evid. 801(d)(1).

Because defendant did not raise below his prior-consistent-statement theory of admissibility, he has waived that argument and cannot raise it on appeal. *State v. Schaaf,* 169 Ariz. 323, 332, 819 P.2d 909, 918 (1991) ("We will not consider an evidentiary theory when it is advanced for the first time on appeal."). Additionally, defendant failed to make an offer of proof in the trial court, and, therefore, there is no meaningful way to determine whether the statement, whatever it was, qualified under Rule 801(d)(1)(B) as a prior consistent statement of the defendant, who had not yet testified. Ariz.R.Evid. 103(a)(2) (stating that error may not be predicated on a ruling excluding evidence unless the substance of the evidence is made known by an offer of proof or is apparent from context); *State v. Bay,* 150 Ariz. 112, 115, 722 P.2d 280, 283 (1986) ("Ordinarily, a ruling of a trial court excluding evidence cannot be reviewed on appeal in the absence of an offer of proof....").

## II. SENTENCING ISSUES

### A. Presentence Mental Health Examination

■ Before sentencing, defendant asked the court to appoint Michael Bayless, Ph.D., to assist him in exploring possible mitigating circumstances. The state objected, arguing that there was no reason for a mental health examination and further that defendant was

not entitled to a psychologist of his choice. The trial court denied the request, stating that no cause for such an examination existed at that time.

Defendant based his motion largely on Michelle's testimony that defendant had told her that he used drugs sometime before the murder, thus purportedly calling into question defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. *See* A.R.S. § 13–703(G)(1) (1989).

▮▮▮▮ Rule 26.5, Arizona Rules of Criminal Procedure, provides, "At any time before sentence is pronounced, the court may order the defendant to undergo mental health examination or diagnostic evaluation." Generally speaking, when a defendant seeks a mental health examination to explore possible mitigating circumstances, the trial court should exercise its discretion in favor of an examination when it finds that it needs more information to determine whether a mitigating factor might exist. *State v. Clabourne,* 142 Ariz. 335, 347, 690 P.2d 54, 66 (1984); *see also* A.R.S. § 13–4013 (1989) (granting indigent defendants in capital cases the right to such experts as are reasonably necessary). However, the rule is discretionary, and we will find an abuse of discretion only if the denial or restriction of funds is shown to have caused substantial prejudice to the defendant. *See Clabourne,* 142 Ariz. at 342, 690 P.2d at 61.

We find no abuse of discretion here. In cases presenting this issue, we have found an abuse of discretion only when the record before the trial court indicated that a presentence mental health exam may well have produced additional evidence supporting mitigation. For example, in *State v. Eastlack,* we remanded for resentencing where the record contained numerous "red flags" suggesting that further examination might have produced mitigating evidence. 180 Ariz. 243, 263, 883 P.2d 999, 1019 (1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1978, 131 L.Ed.2d 866 (1995). In *Eastlack,* there was evidence of cocaine use by the defendant two hours before he committed a double murder. There was also evidence that defendant had symptoms of characterologic pathology and

an antisocial personality disorder. *Id.* at 263, 883 P.2d at 1019. Defendant's mother, a practicing psychologist, also had testified that her son was psychologically impaired and might have brain lesions or neurological problems. *Id.* at 264, 883 P.2d at 1020.

The record here, by contrast, contains little or nothing to suggest that defendant's mental capacity was ever impaired. His mental health was unquestioned throughout the trial. He did not raise an insanity defense and did not request a Rule 11 evaluation. Had defendant been under the influence of drugs when he murdered Rita, expert testimony may have aided the trial court in determining the effect of the drugs on defendant's capacity and thus may have led to additional mitigating evidence. *See State v. Kiles,* 175 Ariz. 358, 374, 857 P.2d 1212, 1228 (1993) (discussing expert mental health testimony where there was ample evidence that the defendant was intoxicated at the time of the murders), *cert. denied,* — U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994).

The evidence here, however, does not show that defendant was under the influence of drugs when he murdered Rita. Defendant has not argued, either below or on appeal, that he was intoxicated by alcohol or drugs when he murdered Rita. In fact, he denied ever using drugs throughout virtually the entire trial and sentencing. No expert, however qualified, could have determined, without foundational evidence from some source, that defendant was under the influence of drugs at any particular time. Because defendant's mental health was unquestioned and because defendant did not show or even assert that he was intoxicated when he murdered Rita, appointing a mental health expert would most likely not have produced any significant mitigating evidence. Under these circumstances, we conclude that the trial court acted within its discretion in denying the motion.

Defendant also asserts, with no legal authority and little argument, that the trial court's denial of funds for an expert violated his right to due process and equal protection under the law. Under the facts of this case, we reject these claims as well.

## B. Independent Review of the Sentence of Death

At sentencing, the trial court found two aggravating factors and concluded that the mitigating circumstances were not sufficiently substantial to call for leniency. On appeal, we must independently review the record to determine the presence or absence of aggravating and mitigating circumstances and to determine whether defendant was properly sentenced to death. *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983), *appeal after remand*, 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). We discuss each aggravating and mitigating factor in turn and conclude that defendant's sentence of death is appropriate.

### 1. Aggravating Factors

#### (a) Prior Felony Involving Violence

The trial court found that defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person within the meaning of A.R.S. § 13–703(F)(2). The trial court based its finding on defendant's convictions for the attempted murder and armed robbery of Norma. Armed robbery is by its terms a felony "involving the use or threat of violence on another person" under the version of section 13–703(F)(2) in effect at the time of defendant's sentencing. *State v. Ramirez*, 178 Ariz. 116, 130, 871 P.2d 237, 251, *cert. denied*, —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994); *State v. Smith*, 146 Ariz. 491, 502, 707 P.2d 289, 300 (1985). Thus, defendant's armed robbery conviction supports the trial court's (F)(2) finding.

Defendant's attempted murder conviction, however, falls into a different category. In order to qualify as an aggravating circumstance under section 13–703(F)(2), the statutory definition of the prior conviction, not its specific factual basis, must involve violence or the threat of violence on another person. *State v. Richmond*, 180 Ariz. 573, 578, 886 P.2d 1329, 1334 (1994). Under section 13–703(F)(2), "violence" is defined as the

"exertion of any physical force so as to injure or abuse." *State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978). If a defendant may commit the crime without the use or threat of violence, the prior conviction cannot support a finding of the section 13–703(F)(2) aggravating circumstance. *Schaaf*, 169 Ariz. at 334, 819 P.2d at 920.

Under Arizona statutes, a person commits an attempt if, acting with the kind of culpability otherwise required to commit an offense, such person intentionally does or omits to do anything which is any step in a course of conduct planned to culminate in commission of an offense. A.R.S. § 13–1001 (1989). A person can, with a culpable state of mind, take an intentional step toward committing first degree murder without exerting or threatening to exert physical force on another person. Under the terms of the statute, then, the crime of attempted first degree murder does not necessarily "involve the use or threat of violence on another person" under section 13–703(F)(2).[1] Thus, the trial court should not have separately relied on the attempted murder conviction in making its (F)(2) finding. *See Schaaf*, 169 Ariz. at 333–34, 819 P.2d at 919–20 (holding that a prior conviction in Nevada for attempted murder could not support a section 13–703(F)(2) finding). Such reliance, however, is immaterial because armed robbery supports the (F)(2) factor separately.

We are aware that, although the trial court found the armed robbery conviction to be a *prior* conviction under section 13–703(F)(2), defendant was convicted of armed robbery simultaneous to his murder conviction and committed the armed robbery *after* murdering Rita. These facts do not, however, invalidate the trial court's finding. Our death penalty statute is not a recidivist or enhancement statute. *State v. Gretzler*, 135 Ariz. 42, 57 n. 2, 659 P.2d 1, 16 n. 2, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Rather, the purpose of an aggravation/mitigation hearing is to determine the character and propensities of the

---

1. After the murder in this case was committed, section 13–703(F)(2) was amended so that attempted first degree murder is now expressly within the scope of the statute. A.R.S. § 13–703(F)(2) (Supp.1994).

defendant. *State v. Valencia,* 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979). That a defendant had been found guilty of other lawless acts of violence is relevant to his character, whether the acts occurred before or after the murder. "Convictions entered prior to a sentencing hearing may thus be considered regardless of the order in which the underlying crimes occurred or the order in which the convictions were entered." *Gretzler,* 135 Ariz. at 57 n. 2, 659 P.2d at 16 n. 2 (citations omitted); *see also State v. Steelman,* 126 Ariz. 19, 25, 612 P.2d 475, 481 (holding that murders committed after the charged murder can support a section 13–703(F)(2) finding), *cert. denied,* 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980). Thus, the validity of the trial court's (F)(2) finding is unaffected by the fact that the convictions were simultaneous or by the fact that the armed robbery occurred after the murder. The trial court properly found the section 13–703(F)(2) aggravating factor based on defendant's conviction for armed robbery.

#### (b) Heinous, Cruel, or Depraved

■■■ The trial court found that defendant committed the murder in an especially heinous or depraved manner. *See* A.R.S. § 13–703(F)(6) (1989). Because the state did not prove beyond a reasonable doubt that Rita was conscious throughout the attack, the trial court did not find cruelty. It found heinousness and depravity based on three of the five factors set forth in *State v. Gretzler:* mutilation, gratuitous violence, and helplessness. *See Gretzler,* 135 Ariz. at 51–53, 659 P.2d at 10–12 (enumerating five factors to be considered when determining whether a murder was committed in an especially heinous or depraved manner under section 13–703(F)(6)). The record supports the trial court's findings.

Unquestionably, this murder involved gratuitous violence. Rita's body was broken, crushed, torn, scraped, shot, dragged, beaten, and bruised. In addition to being shot three times, Rita suffered a savage beating with a hard object, resulting in blunt force injuries covering virtually her entire upper body. Her internal injuries, consisting of pierced and torn organs, were numerous and severe. One of the gunshots completely fractured Rita's right femur, her ribs were fractured in at least thirty-one places and she suffered a broken nose, a fractured breast bone, fractured collar bones, and massive fractures of the pelvic bone. She was run over by an automobile at least twice. The number and nature of Rita's injuries belie any claim that defendant did not inflict violence in excess of that necessary to kill. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 178, 800 P.2d 1260, 1286 (1990) (basing gratuitous violence on large number of stab wounds and contact gunshot wound to the head), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

Rita was also helpless during at least part of the attack. After being shot and beaten, she was unable to defend herself against defendant's further attack. When defendant dragged Rita by her feet into the road, Rita was still alive, but unable to move. She may have been unconscious. Her right leg was completely disabled as a result of the broken femur. Thus, she was totally helpless. *See State v. Ross,* 180 Ariz. 598, 605–06, 886 P.2d 1354, 1361–62 (1994) (finding victim helpless after the first gunshot disabled him); *State v. Chaney,* 141 Ariz. 295, 312–13, 686 P.2d 1265, 1282–83 (1984) (finding victim helpless after defendant's first gunshots injured the victim and trapped him in his car). Accordingly, without discussing the remaining *Gretzler* factors—senselessness, mutilation, and relishing of the murder—we agree with the trial court that defendant committed this murder in an especially heinous or depraved manner within the meaning of section 13–703(F)(6).

### (2) Mitigating Circumstances
#### (a) No Prior Record

■■■ The defendant had no criminal convictions prior to murdering Rita. This is a relevant nonstatutory mitigating circumstance. *State v. Scott,* 177 Ariz. 131, 144, 865 P.2d 792, 805 (1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 73 (1994).

#### (b) Past Good Conduct and Character

■■■ The defendant displayed good character prior to murdering Rita. Until 1989, he was law abiding and had a peaceful reputation. He also once performed CPR on a

neighbor who apparently was having a heart attack, and while working as a lifeguard, defendant saved two people from possible drowning. The state offered no evidence to rebut defendant's evidence of good character prior to 1989. The trial court correctly found past good conduct and character to be a relevant mitigating circumstance. *See State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984) (saving a life is a mitigating circumstance), *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985); *cf. State v. Stokley,* 182 Ariz. 505, 524–25, 898 P.2d 454, 473–74 (1995) (rejecting good character as a mitigating factor where the state offered evidence in rebuttal).

### (c) Drug Use

■ Defendant argues on appeal that the trial court should have given mitigating weight to his alleged drug addiction. Use of drugs is a statutory mitigating circumstance only if the evidence shows that, at the time of the offense, drugs "significantly impaired defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *State v. White,* 168 Ariz. 500, 513, 815 P.2d 869, 882 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992) (quoting *State v. Zaragoza,* 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983)). If impairment does not rise to the level of a statutory mitigating circumstance, such impairment may constitute a nonstatutory mitigating circumstance when viewed in light of a history of alcohol or drug abuse. *Stokley,* 182 Ariz. at 522–24, 898 P.2d at 471–73; *State v. Gallegos,* 178 Ariz. 1, 17, 870 P.2d 1097, 1113, *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).

Defendant has not proved that his alleged drug use was a mitigating circumstance, either statutory or nonstatutory. Michelle testified that defendant started using cocaine approximately six months before he murdered Rita and that defendant was more violent when he used cocaine. She also testified that defendant told her he was using drugs the day before the murder. However, as we have already noted, defendant denied throughout the trial and almost all the sentencing that he ever used drugs. Defendant offered no evidence showing that he was intoxicated when he murdered Rita.

■ Defendant, thus, has not shown or even argued that he suffered any impairment when he killed Rita. Without a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind. *See Wood,* 180 Ariz. at 70–71, 881 P.2d at 1175–76; *White,* 168 Ariz. at 513, 815 P.2d at 882; *Gallegos,* 178 Ariz. at 17, 870 P.2d at 1113 (addressing history of alcohol and drug abuse as a nonstatutory mitigating circumstance only after finding evidence that the defendant was intoxicated on the night of the murder). We agree with the trial court, which said, "[T]here was no evidence, including considering the Defendant's own testimony, to indicate that the cocaine usage by Defendant was a factor in the perpetration of the murder."

### (d) Duress and the Victim As the Initial Aggressor

■ A trial judge must consider in mitigation whether the defendant was "under unusual and substantial duress, although not such as to constitute a defense to prosecution." A.R.S. § 13–703(G)(2) (1989). Duress is defined as "any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *State v. Castaneda,* 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986) (quoting Black's Law Dictionary 452 (5th ed. 1979)). To find duress under this definition, one person must coerce or induce another person to do something against his will. *Id.*

■ It is undisputed that Rita went to defendant's apartment, acted belligerently, and confronted defendant with a gun. It is equally clear from the record, however, that defendant disarmed Rita shortly after she displayed the gun and that Rita thereafter presented no appreciable threat to defendant. After she was disarmed, any chance of "unusual and substantial duress" ended. Thus, defendant has not proven this statuto-

ry mitigating circumstance. Nor has he proved that Rita's status as the initial aggressor is a relevant mitigating factor.

### (e) A Member of the Victim's Family Supports Life Imprisonment

Rita's sister submitted a statement to the court recommending life imprisonment because she did not want defendant's family to suffer the way her family had suffered after Rita's death. When a defendant is being sentenced for first degree murder, the sentencing court must consider any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate. *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Rita's sister based her recommendation of a life sentence on her family's grief and on a concern for defendant's family. Her opinion was altogether unrelated to defendant, to his character, or to the circumstance of the offense. Thus, we do not find the sister's recommendation to be a relevant mitigating circumstance.

### (f) Defendant's Strong Relationship with His Family

The record shows that defendant has a strong relationship with his family. Before his arrest, defendant was a contributing member of his household, and he maintained close ties with his parents, his brothers, and his sons. We consider this a mitigating circumstance. *See Carriger,* 143 Ariz. at 162, 692 P.2d at 1011. We note, however, that these relationships did not stop defendant from killing his son's mother. *See id.* (discounting the mitigating value of love among family because it did not deter defendant from committing crime). Moreover, Rita had once lived with defendant's parents for more than two years, and both of defendant's parents described Rita as the daughter they never had. Because defendant murdered a person who was in many ways a member of his family, we give defendant's family relationship little mitigating weight.

### (g) Defendant's Age

Age may be a mitigating circumstance. Under the circumstances of this case, however, we give defendant's age of twenty-three no weight in mitigation. "When addressing the issue of young age, we look at the defendant's level of maturity, judgment, past experience, and involvement in the crime." *State v. Bolton,* 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995). Defendant was living an adult lifestyle, and there is no evidence of immaturity. Rita's murder was not impulsive. Defendant took Rita to a place different from their initial altercation, inflicted a prolonged beating, positioned her body to be run over, and then tried to conceal evidence. These actions, rather than impulsive, were quite deliberate. *See State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (holding that carrying out a crime over a significant period of time shows relative maturity and minimizes the weight of young age as a mitigating factor), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

### (h) Defendant's Race

Defendant argued to the trial court that his race (African–American) should be a mitigating factor. The trial court rejected this proposed mitigating factor, and we agree.

### C. Victim Recommendations of Appropriate Sentence

The presentence report revealed that Rita's father wanted defendant sentenced to death. Also, the attempted murder victim, Norma, filed a statement recommending the death penalty and appeared at sentencing to say that if defendant was not sentenced to death, he should at least get life in prison. Defendant argues on appeal that a resentencing is required because the victims' statements are not relevant to any of the aggravating factors specifically enumerated in our death penalty statute. *See* A.R.S. § 13–703(F) (1989). Defendant does not raise any constitutional challenge to the victim impact evidence.

We acknowledge that a victim's recommendation on the appropriate sentence is not relevant to any of our statutory aggravating factors. *Bolton*, 182 Ariz. at 315, 896 P.2d at 855. However, absent evidence to the contrary, we have in the past assumed that the trial judge in a capital case is capable of focusing on the relevant sentencing factors and setting aside the irrelevant, inflammatory, and emotional factors. *Id.* There is nothing in the record here to indicate that the judge considered or gave any weight to the victims' recommendations when he sentenced defendant on the capital count.

### D. Constitutionality of Arizona's Death Penalty Statute

Defendant argues that Arizona's death penalty scheme is unconstitutional for two reasons. First, he argues that it fails to narrow the class of persons eligible for death and fails to provide guidance to the sentencing court. Second, he argues that the death penalty violates evolving standards of decency in the world community. We reject both arguments. *See Walton v. Arizona*, 497 U.S. 639, 652–56, 110 S.Ct. 3047, 3056–57, 111 L.Ed.2d 511 (1990); *Gregg v. Georgia*, 428 U.S. 153, 169–87, 96 S.Ct. 2909, 2923–31, 49 L.Ed.2d 859 (1976); *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

### DISPOSITION

We have considered all the issues that defendant has raised and find that his convictions are proper. We have conducted an independent review of defendant's sentence of death and agree with the trial court that the death penalty is appropriate here. We have searched the record and found no fundamental error. *See* A.R.S. § 13–4035 (1989). We therefore affirm defendant's convictions and sentences.

CORCORAN, ZLAKET and MARTONE, JJ., concur.

FELDMAN, Chief Justice, specially concurring

I concur in both the court's analysis and result. I write separately to emphasize one point continually ignored by bench and bar when presenting victims' testimony at sentencing in capital cases. As the court's opinion states, the survivors' recommendation on the "appropriate sentence is not relevant to any of our statutory aggravating factors." Op. at 386, 904 P.2d at 455, citing *State v. Bolton*, 182 Ariz. 290, 315, 896 P.2d 830, 855 (1995). In fact, such testimony in capital cases is forbidden. *Booth v. Maryland*, 482 U.S. 496, 502–03, 107 S.Ct. 2529, 2533, 96 L.Ed.2d 440 (1987). This part of *Booth* was not overruled by *Payne v. Tennessee*, 501 U.S. 808, 830 n. 2, 111 S.Ct. 2597, 2611 n. 2, 115 L.Ed.2d 720 (1991).

As the court says, "we have in the past assumed that the trial judge ... is capable of focusing on the relevant sentencing factors and setting aside the irrelevant, inflammatory and emotional factors." Op. at 386, 904 P.2d at 455, citing *Bolton*, 182 Ariz. at 315, 896 P.2d at 855. The court correctly notes that the record does not indicate that the trial judge "considered or gave any weight to the victims' recommendations when he sentenced Defendant on the capital count." It is also true, however, that the record does not indicate that the trial judge did not give any weight to this evidence. The record is silent. We have presumed that trial judges will ignore such testimony, but one must wonder how accurate such an assumption may be. The sentencing decision in many capital cases is difficult enough without subjecting the trial judge to the emotional pressure of listening to the victims' understandable but legally inadmissible recommendations, often motivated by the need for catharsis and sometimes by the desire for revenge.

I do not overlook or denigrate the plight of the victims or their needs. But courts sit as neutral, impartial tribunals to administer justice. We must decide cases according to law and logic, not emotion. We do not sit to provide revenge, or even solace or catharsis. These must come from other sources.

I believe the time is near for the court to take a position forbidding the introduction of evidence calculated to influence the sentencing judge in a manner forbidden by the law.

It should not be offered by the prosecution or permitted by the court.